[Cite as *State v. Burns*, 2014-Ohio-4625.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NO. CA2013-10-019 |
| Plaintiff-Appellee, | : | |
| | | O P I N I O N |
| | : | 10/20/2014 |
| - vs - | | |
| | : | |
| CHARLES B. BURNS, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI2012-5413


Richard W. Moyer, Clinton County Prosecuting Attorney, Matthew M. Suellentrop, 103 East Main Street, Wilmington, Ohio 45177, for plaintiff-appellee

Foster Law, LLC, Mary T. Foster, 636 Northland Boulevard, Suite 100, Cincinnati, Ohio 45240, for defendant-appellant


**S. POWELL, J.**

{¶ 1} Defendant-appellant, Charles B. Burns, appeals from his convictions in the Clinton County Court of Common Pleas for single counts of receiving stolen property and failure to comply with the order or signal of a police officer. For the reasons outlined below, we affirm.

{¶ 2} On December 17, 2012, a Clinton County grand jury returned an indictment charging Burns with receiving stolen property in violation of R.C. 2913.51(A), a fourth-degree

felony under R.C. 2913.51(C), and failure to comply with the order or signal of a police officer in violation of R.C. 2921.331(B), a third-degree felony. The charges stemmed from allegations Burns stole a white 2006 Chevrolet Tahoe owned by Terry Lee Burden from his Lynchburg, Highland County, home on the evening of November 25, 2012, thus prompting a high-speed chase with police that ultimately culminated in Clinton County. Following the two-day jury trial, Burns was found guilty of both charges and sentenced to serve a total of four years in prison.

{¶ 3}   Burns now appeals from his convictions, raising two assignments of error for review.

{¶ 4}   Assignment of Error No. 1:

{¶ 5}   THE RECEIVING STOLEN PROPERTY AND FAILURE TO COMPLY WITH ORDER OR SIGNAL OF POLICE OFFICER CONVICTIONS MUST BE REVERSED BECAUSE THEY WERE OBTAINED THROUGH INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION.

{¶ 6}   In his first assignment of error, Burns argues his convictions must be reversed because he received ineffective assistance of trial counsel. We disagree.

{¶ 7}   Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Hendrix*, 12th Dist. Butler No. CA2012-05-109, 2012-Ohio-5610, ¶ 14. In turn, to prevail on an ineffective assistance of counsel claim, Burns must show his trial counsel's performance fell below an objective standard of reasonableness and that he was prejudiced as a result. *State v. Ward-Douglas*, 12th Dist. Warren No. CA2011-05-042, 2012-Ohio-4023, ¶ 96, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 693, 104 S.Ct. 2052 (1984). In order to demonstrate prejudice, Burns must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of trial would have been different. *State v. Kinsworthy*,

- 2 -

12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 42. A "reasonable probability" is a probability that is "sufficient to undermine confidence in the outcome." *State v. Burke*, 97 Ohio St.3d 55, 2002-Ohio-5310, ¶ 6, quoting *Strickland* at 694. The failure to make an adequate showing on either prong is fatal to an ineffective assistance of counsel claim. *State v. Zielinski*, 12th Dist. Warren No. CA2010-12-121, 2011-Ohio-6535, ¶ 50.

{¶ 8} Initially, Burns argues his trial counsel rendered ineffective assistance by eliciting testimony on direct examination regarding his criminal past from his two alibi witnesses, Cynthia Benner, a family friend, and Stella Mae Burns, his mother. However, it is now a well-accepted "trial strategy 'for a party to "draw the sting" of cross-examination by bringing out, on direct examination, facts that tend to discredit that party's own witness.'"[1] *State v. Johnson*, 11th Dist. Ashtabula No. 2009-A-0050, 2010-Ohio-3046, ¶ 36, quoting *State v. Tyler*, 50 Ohio St.3d 24, 34 (1990).

{¶ 9} Moreover, as this court has stated previously, trial counsel's decision to engage, or not engage, in a particular line of questioning is presumed to be the product of sound trial strategy. *State v. Davis*, 12th Dist. Butler No. CA2012-12-258, 2013-Ohio-3878, ¶ 25. In fact, as this court has consistently held, even debatable trial tactics and strategies do not constitute ineffective assistance of counsel. *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 41 (12th Dist.); *State v. Bai*, 12th Dist. Butler No. CA2010-05-016, 2011-Ohio-2206, ¶ 136; *State v. Cox*, 12th Dist. Butler No. CA2005-12-513, 2006-Ohio-6075, ¶ 29; *see also State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Therefore, because this court will not second-guess Burns' trial counsel's strategic decision to engage his two alibi

---

1. We note that Burns' trial counsel first informed the jury about Burns' criminal past during voir dire, specifically acknowledging that Burns was "currently on probation in another jurisdiction." Burns, however, did not challenge this as part of his appeal. Nevertheless, even if he had raised this issue on appeal, this has also been found not to rise to the level of ineffective assistance of counsel. *See*, *e.g.*, *State v. Johnson*, 9th Dist. Medina No. 12CA0066-M, 2014-Ohio-62, ¶ 27 (finding "Johnson's trial counsel was not ineffective for introducing Johnson's prior record during voir dire"); *State v. Woods*, 8th Dist. Cuyahoga No. 88363, 2007-Ohio-2229, ¶ 18 (finding appellant was not subject to ineffective assistance of counsel where counsel made reference to appellant's prior convictions during voir dire).

witnesses in this particular line of questioning, Burns' first argument lacks merit.

{¶ 10} Burns next argues his trial counsel rendered ineffective assistance by failing to object to the state's questioning of Benner and Stella Mae on cross-examination regarding his criminal past. However, "[t]he failure to object is not a per se indicator of ineffective assistance of counsel, because sound trial strategy might well have been not to interrupt." *State v. Ward*, 5th Dist. Richland No. 2011-CA-100, 2012-Ohio-4807, ¶ 31, citing *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995).

{¶ 11} Furthermore, as discussed more fully above, Burns' trial counsel had already opened the door to this line of questioning during his own direct examination of the same two alibi witnesses, thereby rendering any objections to the state's questioning futile. *See State v. Petit*, 12th Dist. Butler No. CA2009-03-084, 2009-Ohio-6925, ¶ 40 (overruling claim alleging ineffective assistance where "appellant opened the door to the state's inquiry regarding his five prior OVI convictions, and therefore, any objection to the state's questioning would have been futile"). This line of questioning was also proper for impeachment purposes to refute claims that Burns had only had minor brushes with the law. Therefore, Burns' second argument also lacks merit.

{¶ 12} Finally, Burns argues his trial counsel rendered ineffective assistance by failing to object and challenge for cause "two separate jurors that informed the court during the trial that they knew and/or had a prior relationship with the testifying witnesses." Generally speaking, "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, ¶ 53, quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639 (1961). In turn, "when a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant "*must* show that the juror was *actually biased* against him.'" (Emphasis added.) *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 67,

quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th.Cir.2001). However, where "jurors demonstrate during voir dire that they are able to remain fair and impartial, no action will lie for ineffective assistance of counsel for not seeking their removal." *State v. Bofia*, 3d Dist. Henry No. 07-03-12, 2004-Ohio-3018, ¶ 14.

{¶ **13**} In this case, the two jurors at issue, A.O. and S.M., informed the trial court that although they initially denied knowing any of the potential witnesses named during voir dire, they each later recognized a witness once that witness was called to the stand to testify. Both jurors, however, also explicitly stated that this would not in any way affect their ability to remain an unbiased and impartial member of the jury. For instance, when asked if he would be influenced by the fact that he had been on the same high school wrestling team as the state's witness, Ronald L. Cummings, A.O. informed the trial court that he would not. Similarly, S.M. also informed the trial court that he would not be influenced by the fact he lives in a same neighborhood as Burns' mother, Stella Mae. As S.M. stated, "It does not influence my decision." Therefore, because Burns failed to show either juror was actually biased against him, we find Burns' final argument likewise lacks merit.

{¶ **14**} In light of the foregoing, and having found no merit to any of the three arguments advanced herein, Burns' first assignment of error is overruled.

{¶ **15**} Assignment of Error No. 2:

{¶ **16**} THE RECEIVING STOLEN PROPERTY AND FAILURE TO COMPLY WITH ORDER OR SIGNAL OF POLICE OFFICER CONVICTIONS MUST BE REVERSED BECAUSE THEY WERE OBTAINED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ **17**} In his second assignment of error, Burns argues his convictions must be reversed as they were against the manifest weight of the evidence. In addition, although not explicitly raised as part of his assignment of error, Burns also argues the state provided

insufficient evidence to support his convictions. We disagree with both arguments.

{¶ 18} At the outset, we note "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Wright*, 12th Dist. Butler No. CA2012-08-152, 2014-Ohio-985, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1987). Nevertheless, it is now well-established that finding a conviction is supported by the manifest weight of the evidence is also dispositive of the issue of sufficiency. *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19, citing *State v. Church*, 12th Dist. Butler No. CA2011-04-070, 2012-Ohio-3877, ¶ 10. Therefore, "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Hart*, 12th Dist. Brown No. CA2011-03-008, 2012-Ohio-1896, ¶ 43; *State v. Kinsworthy*, 12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 54.

{¶ 19} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, this court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 20} However, "[w]hile appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, 'these issues are primarily matters for the trier of fact to decide.'" *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81, quoting *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-

911, ¶ 26. As a result, we will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶ 21} As noted above, Burns was convicted of receiving stolen property in violation of R.C. 2913.51(A), a fourth-degree felony under R.C. 2913.51(C), which provides "[n]o person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Burns was also convicted of failure to comply with the order or signal of a police officer in violation of R.C. 2921.331(B), a third-degree felony. Pursuant to that statute, "[n]o person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop."

{¶ 22} At trial, Terry Lee Burden, the owner of the vehicle at issue, testified that he received a call at approximately 2:00 p.m. on November 25, 2012 from a man identifying himself as "Robert" inquiring about the white 2006 Chevrolet Tahoe he posted for sale online. After some discussion regarding the vehicle, Burden testified he texted "Robert" his address so that he could come and look at the vehicle later that afternoon. According to Burden, "Robert" was "kind of mumbling, soft spoken, very soft. I couldn't hardly understand him." Burden then testified that he and "Robert" exchanged a series of text messages, wherein "Robert" claimed he was on his way to Lynchburg and that he should arrive around 6:00 p.m.

{¶ 23} At approximately 8:00 p.m., Burden testified that "Robert" rang his doorbell claiming the GPS directions took him to an apartment building next door. Although somewhat suspicious, Burden testified he nevertheless took "Robert" over to the vehicle for inspection. When asked if there was anything unique or distinctive about "Robert," Burden testified that "he was just very soft spoken. I had to keep almost staring at him to

understand." In addition, when asked what he thought of "Robert" after he arrived at his house late that evening, Burden testified that he was "[v]ery leary. I didn't really want to show him the car. It was just dark outside and I didn't feel at ease at all."

{¶ 24} After about five minutes walking around the vehicle, Burden testified he agreed to go with "Robert" for a test drive. During this test drive, which lasted approximately 20 minutes, Burden testified that he was "staring at ["Robert"] the whole time." Specifically, Burden testified:

> Q: Where were you looking when you were watching him?
>
> A: Mostly his lips.
>
> Q: Why?
>
> A: Because you had to really pay attention to what he was saying. He never would look at you, but he'd almost mumble something that I was trying to be polite and not to ask him to repeat himself.
>
> Q: Did he make eye contact with you?
>
> A: Hardly ever.

{¶ 25} Following their test drive, and upon arriving back at his house, Burden testified that "Robert" took the title to the vehicle in order to run a "car facts" check through his phone. However, when the call failed, Burden testified "Robert" put the certificate of title into the driver's side door pocket and popped the hood, inquiring about the size of the engine. Burden then testified as follows:

> Yeah, and about that time, he goes like that and reaches down and pulls the hood latch, so we get out and he's looking under the hood and he's taking his phone and he's trying to look for the number on the motor and I am good with my cell phone and not having much luck I said just a minute, I'll go and get a flashlight. So, I go towards the door and that's when I heard the hood slam and gravel flying and he takes off.

According to Burden, the car then headed north on State Route 134 towards Wilmington, located in Clinton County. Burden then called police to report the stolen vehicle.

{¶ 26} Approximately 10 minutes later, Sergeant Craig Seman of the Highland County Sheriff's Office responded to Burden's residence. Once there, Sergeant Seman spoke with Burden who described "Robert" as a black male with short hair standing approximately six feet tall and weighing 175 pounds. After taking this report, Sergeant Seman radioed dispatch, who then put out a notice to surrounding counties and law enforcement officials to be on the lookout for the stolen vehicle. Sergeant Seman then left Burden's residence heading back towards Highland County and the sheriff's office.

{¶ 27} Approximately ten minutes after leaving Burden's home, Sergeant Seman received word that the Wilmington Police Department had been engaged in a high-speed pursuit of the stolen vehicle, but that the driver had wrecked and fled on foot. Sergeant Seman then returned to Burden's residence. Once there, Burden testified that Sergeant Seman informed him, in pertinent part, the following:

> And, he said, I've got good news and bad news. The good news is we've got your car back, the bad news is he wrecked it. I said well, you know, I hope he got a bloody nose out of it and he said, well, he said that he bailed, I guess and wrecked the car and jumped out and took off. He said well, we'll keep you advised and he left.

{¶ 28} After another ten minutes had past, Sergeant Seman received word from the Wilmington Police Department that they had a name of a suspect, that being Charles Burns. As Sergeant Seman testified:

> I was probably only ten minutes away from the Burden residence again, just outside of Lynchburg, so I returned again and showed a photo of the suspect to Mr. Burden to see if he could identify him, if they looked close, if he thought that were was even a chance that this was the right guy. Went back and showed [him] a BMV image or a Bureau of Motor Vehicle image, basically a driver's license picture of this suspect, and he immediately identified the suspect.

{¶ 29} When asked how confident he was that the picture shown to him that evening was man who identified himself as "Robert" and test drove his vehicle, Burden testified

"100%." Burden also testified that "when something like that happens, it stays in your mind." Burden then made a positive in-court identification of Burns as the assailant, wherein he again testified he was "100%" sure Burns was the man who stole his vehicle.

{¶ 30} Deputy Anthony Mitchell of the Clinton County Sheriff's Office also testified at trial. According to Deputy Mitchell, on the evening of November 25, 2012, he responded to a call that Officer Matt Hamilton of the Wilmington Police Department was in pursuit of the stolen vehicle as it traveled north towards Wilmington on State Route 730. After receiving word of the pursuit, Deputy Mitchell testified he joined the chase with his lights and siren activated. At that time, Deputy Mitchell estimated he was traveling at approximately 65 m.p.h. to 70 m.p.h. in a 35 m.p.h. zone. Thereafter, Deputy Mitchell testified as follows:

Q: What happened after that?

A: We were advised to head towards Doan Street because the vehicle went back behind the City (inaudible) building.

Q: And, what did you do in response to that?

A: Turned on Walnut and Holly and once I turned on Holly, I observed the vehicle coming back towards me (inaudible).

Q: At that point you still had your lights on[?]

A: Correct.

Q: You were coming at a head on direction with the Tahoe?

A: Yes.

Q: What happened at that point?

A: I stopped, the vehicle goes around Officer Hamilton, who was still in front of me, the vehicle went around and actually swiped the side of my car.

Deputy Mitchell then testified he turned his cruiser around and began pursuing the stolen vehicle again, but was unable to continue his pursuit after the vehicle "jumped the curve."

{¶ 31} Shortly after losing sight of the stolen vehicle, Deputy Mitchell testified he was

dispatched to Mulberry Street on reports that a vehicle matching the description of the stolen vehicle was parked behind a nearby residence. Upon arriving at the scene, Deputy Mitchell testified that he confirmed the vehicle parked on Mulberry Street was in fact the stolen vehicle he and Officer Hamilton had been pursuing. The driver of the vehicle, however, was not at the scene.

{¶ 32} Next to testify at trial was Ronald L. Cummings. Cummings, who lives in Wilmington on Mulberry Street, testified he was on his back porch with his nephews on the evening of November 25, 2012 when he heard an "unusually loud noise," which he characterized as a "crashing, pretty loud thud." Cummings then testified he watched as "a white SUV pulled into the back of the driveway, coming from the alley, parked at the very end." After a few minutes had past, Cummings testified that someone exited from the driver's side of the vehicle, but that he could not clearly identify the person who emerged.

{¶ 33} Continuing, Cummings testified he saw the driver of the vehicle move towards a "small white car" that had just slowly driven past the alleyway. Finding it odd that anyone would park at the end of the alleyway, Cummings testified he waited for a few minutes before approaching the vehicle. Once he approached the vehicle, however, Cummings testified he "noticed the front bumper was damaged pretty good" and that it looked like it was "freshly wrecked" having "a little bit of grass and different kind of debris stuff on it." Cummings then called police. Once police arrived a few minutes later, Cummings relayed his observations to police, including the fact that he saw the driver of the wrecked vehicle walk in the direction of a slow moving small white car as it drove past.

{¶ 34} Officer Hamilton then testified regarding his pursuit of the stolen vehicle, which he claims reached speeds upwards of 90 m.p.h. Specifically, after the stolen vehicle hit Deputy Mitchell's cruiser, Officer Hamilton testified he lost sight of the vehicle and stopped his pursuit. However, just a few minutes later, Officer Hamilton testified he was advised of an

accident involving a "white Tahoe" at the intersection of Mulberry Street and Main Street. Officer Hamilton then testified he drove to the scene of the accident. Once there, Officer Hamilton testified he was told the stolen vehicle was parked in the alleyway off Mulberry Street, and that the driver of the vehicle may have gotten into a small white car. Officer Hamilton then testified he began patrolling the area in hopes of locating the small white car in question.

{¶ 35} Shortly after leaving the scene of the accident, Officer Hamilton testified he noticed a small white car on Mulberry Street just north of where the stolen vehicle was then located. Following the vehicle for a short distance, Officer Hamilton testified the small white car rolled through a stop sign, thus prompting him to initiate a traffic stop.

{¶ 36} After initiating the traffic stop, Officer Hamilton testified, in pertinent part, as follows:

> Q: And, what happened after you pulled the vehicle over?
>
> A: As the vehicle pulled into that driveway, the passenger door immediately opened. I saw [Burns] step out of the vehicle, look back at me and then took off on foot.
>
> Q: Did you say you saw [Burns], was he stepping out of the driver's side, or the passenger's side?
>
> A: The front passenger's side.
>
> Q: How did you immediately recognize him?
>
> A: I've had contact with [Burns] on several occasions through different calls, traffic stops.
>
> Q: So you knew who it was, it wasn't as though you had to think to yourself, who was that guy?
>
> A: No.
>
> Q: You immediately identified him?
>
> A: Correct.

{¶ 37} Officer Hamilton then testified that he approached the driver's side of the

vehicle, where he identified Burns' brother, Nathan Burns, as the driver. Drug paraphernalia was also located inside the car. Burns was later arrested after he was found hiding under his mother's residence on December 10, 2012. After playing video of the high speed chase and the traffic stop of the small white vehicle depicting Burns fleeing from the scene, the state then rested.

{¶ 38} In his defense, Burns' trial counsel initially called Benner, a family friend, as well as his mother, Stella Mae. Specifically, Benner testified that she went to Stella Mae's house to help her hook up a television converter box on the evening of November 25, 2012. According to Benner, Burns was at his mother's house until approximately 9:00 p.m. that evening when he was picked up by his brother Nathan. Stella Mae also testified that Burns was at her home until 9:00 p.m. when Nathan picked him up. She then testified that Burns called her at approximately 9:30 p.m. that night saying they had been pulled over by police. Stella Mae also testified that she and Benner were sitting around the house at around 8:00 p.m. listening to her police scanner when they heard "a 2006 Chevy Tahoe had been stolen from Lynchburg." During this time, Stella Mae claims Burns was still in his room and had not yet been picked up by Nathan.

{¶ 39} Burns also testified as part of his defense. According to Burns' testimony, on the evening of November 25, 2012, he was in his room at his mother's Clinton County residence watching movies and listening to the radio when he got a call from an ex-girlfriend in Wilmington wanting him to come over. Not having a car, Burns testified he called his brother Nathan to pick him up. Burns then testified that his brother picked him up in a white Dodge Neon at approximately 9:00 p.m. to take him to Wilmington. Burns then testified as follows:

Q: And, what happened when you got to Wilmington?

A: When we got to Wilmington, as soon as we got on the one street, it was there by Dominos, we got on the street and the cop

car turned straight around on us.

Q: Okay.

A: And, I had warrants, so, I was ready to run because I had warrants, plus there was needles in the car.

Q: Okay. The police then in fact pulled you over?

A: Yes, they did.

Q: What did you do?

A: Left.

**{¶ 40}** Burns later testified that he never met Burden, did not answer any online ads to purchase a white 2006 Chevrolet Tahoe, and had never even driven such a vehicle. Burns also testified that he and his brother got into Wilmington at approximately 9:20 p.m. that evening. However, on rebuttal, Officer Hamilton testified that he first noticed the small white car from which Burns fled at 9:03 p.m. and initiated the traffic stop at 9:06 p.m.

**{¶ 41}** As can be seen, the sole issue in this case was the identity of the individual who stole the white 2006 Chevrolet Tahoe from Burden. As a result, this case, just like many others before, was dependent upon the jury's findings regarding the credibility of witnesses and weight given to the evidence as it relates to the perpetrator's identity. To that end, the jury clearly found Burden's testimony that he was "100%" sure Burns stole the vehicle to be credible. "As the trier of fact is in the best position to judge the credibility of the witnesses, we will not disturb the trial court's finding in regard to which version of events was credible, and which was not." *State v. Bonner*, 12th Dist. Butler No. CA2012-09-195, 2013-Ohio-3670, ¶ 13. This is particularly true here given the fact that Burden specifically testified he recognized Burns after "staring at him the whole time" during their 20 minute test drive of the vehicle. Again, as Burden testified, "when something like that happens, it stays in your mind."

**{¶ 42}** Moreover, although faced with conflicting evidence, "[i]t is well-established that

when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17. This is true regardless of the fact that some of the evidence presented at trial was purely circumstantial. "Like any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." *State v. Tate*, Slip Opinion No. 2014-Ohio-3667, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273 (1991). This is because circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Perkins*, 12th Dist. Preble No. CA2012-09-012, 2013-Ohio-3409, ¶ 9; *see also State v. Curtis*, 12th Dist. Brown No. CA2009-10-037, 2010-Ohio-4945, ¶ 22 ("a conviction based on purely circumstantial evidence is no less sound than one based on direct evidence").

**{¶ 43}** In light of the foregoing, because the evidence presented at trial does not weigh heavily in favor of acquittal, and in fact verges on overwhelming evidence of his guilt, we simply cannot say the jury erred and clearly lost its way by finding Burns guilty as charged. Therefore, as Burns' convictions were not against the manifest weight of the evidence and were otherwise supported by sufficient evidence, Burns' second assignment of error is overruled.

**{¶ 44}** Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.