[Cite as *State v. Partin*, 2020-Ohio-4624.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-05-079 |
| | : | O P I N I O N |
| - vs - | | 9/28/2020 |
| | : | |
| LINDSAY PARTIN, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2018-03-0462

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Rittgers & Rittgers, Attorneys at Law, Neal D. Schuett, 121 West High Street, Oxford, Ohio 45056, for appellant

**RINGLAND, J.**

{¶1} Lindsay Partin appeals her convictions in the Butler County Common Pleas Court for endangering children, involuntary manslaughter, and murder. For the reasons described below, this court affirms Partin's convictions.

{¶2} This case involves the death of Hannah Wesche, who was hospitalized with a traumatic brain injury on March 8, 2018, never recovered, and passed away ten days

later. Hannah was 3 years and 2 months old at the time of her passing.

{¶3} Partin had been Hannah's babysitter. On the morning of March 8, Hannah's father, Jason Wesche, dropped Hannah off with Partin and left to go to work. Minutes later, Partin called Jason and told him that something was wrong with Hannah. Jason raced back. Hannah was struggling to breath and unresponsive. Emergency responders rushed Hannah to the hospital.

{¶4} Hannah had multiple bruises over her body, hemorrhages in both eyes, and a CT scan revealed a large subdural hemorrhage. Given her injuries, doctors and investigators suspected that Hannah's injuries were nonaccidental.

{¶5} Detectives interviewed Partin that day. Partin denied any knowledge of what happened to Hannah, claimed that she seemed fine, and stated that Hannah just collapsed upon walking into Partin's home. Detectives interviewed Partin again the following day, during which she made multiple inculpatory statements admitting to excessively disciplining Hannah earlier that week and shaking Hannah on the morning of March 8.

{¶6} Following Hannah's death, a Butler County grand jury indicted Partin on six counts. Counts one and two charged Partin with committing felony endangering children against Hannah on the two days leading up to March 8, 2018. The remaining counts charged Partin with acts occurring on March 8, 2018, constituting felony endangering children (counts three and five), involuntary manslaughter (count four), and murder (count six). Counts three and five served as the predicate, underlying offenses for counts four and six, respectively.

{¶7} The matter proceeded to a jury trial in April 2019. The state played Partin's call to 9-1-1, in which she relayed that Hannah had just "passed out." Partin told the dispatcher that Hannah "was fine," that she "walked into the house and just passed out" and that she "went limp." Twice during the call, Partin mentioned that Hannah "fell really

bad yesterday." Partin also mentioned a bruise under Hannah's chin.

{¶8} Evan Reedy, an EMT, responded to the 9-1-1 call at Partin's residence, located at 4050 Shank Road, Hanover Township. EMT Reedy testified that when he arrived, Hannah was laid on a couch. Her breathing was like a "sniffing," shallow and irregular. Her eyes were moving, but without purpose. Reedy noticed some bruising on various parts of Hannah's body, including the chest and eyes, which appeared sunken. Partin told him, another EMT, and a deputy on scene, that Hannah had fallen after standing on a toy a day earlier. Reedy and the other EMT secured Hannah for travel and then transported her to Fort Hamilton Hospital.

{¶9} Deputy Damon Mayer testified that he was on road patrol for the Butler County Sheriff's Office that morning and responded to the 9-1-1 call. He noted bruising on Hannah's left eye and chin. Partin told him that Hannah had walked through the garage, walked up the steps, asked Partin for a donut and to sit on the couch, and then "passed out," falling forward onto the carpeted floor. Partin also said that on the previous day, at 4:00 p.m., Hannah had been playing in the garage and fell and hit her head on concrete. Partin said she had informed Jason about this accident.

{¶10} Dr. Ahn Quan Nguyen, an emergency room physician at Fort Hamilton Hospital, treated Hannah upon her arrival. Hannah was unresponsive and not able to breathe on her own. Dr. Nguyen intubated Hannah and placed her on a ventilator. He observed multiple bruises on Hannah's body, and further observed that her pupils were not reacting appropriately, and that there was blood behind her eyes. Dr. Nguyen ordered a CT scan of Hannah's head, neck, and face. Dr. Nguyen ordered that Hannah be transported by air care to Cincinnati Children's Hospital for further treatment. Hannah left on an air care flight approximately one hour after arriving at Fort Hamilton Hospital.

{¶11} Dr. Marguerite M. Caré is the staff neuroradiologist at Cincinnati Children's

Hospital and testified for the state as an expert in pediatric radiology. On March 8, 2018, Dr. Caré reviewed Hannah's CT scans taken at Fort Hamilton Hospital. Hannah had a large subdural hemorrhage that was causing the mid-line of her brain to shift over to one side of her skull. Dr. Caré explained that this shifting would have caused brain injuries and significant brain abnormalities.

{¶12} Dr. Caré noted that the most likely cause of the subdural hemorrhage was trauma. Furthermore, Dr. Caré opined that the subdural hemorrhage seen in Hannah's case was not consistent with everyday accidents, like a fall, but instead was consistent with "abusive head trauma." With Hannah's injuries, Dr. Caré would not have expected her to be walking, or able to breathe on her own, and she would have been unconscious. Furthermore, Dr. Caré opined that these symptoms would have started *within seconds* of the injury.

{¶13} Based on Hannah's CT scans, Dr. Caré determined that Hannah required immediate medical intervention. She shared her findings with a neurosurgeon who then removed a part of Hannah's skull in order to drain the hemorrhage. The surgery was successful in draining the hemorrhage. However, because Hannah's brain had swollen from the injury, it began to swell out of the area where the surgeon removed the portion of skull.

{¶14} Dr. Michael Yang is a board certified ophthalmologist at Cincinnati Children's Hospital and testified for the state as an expert witness in pediatric ophthalmology. Dr. Yang examined Hannah's eyes and found them to be extensively hemorrhaged. Hemorrhages were present in all three layers of the eye. Dr. Yang opined that Hannah's eye condition was most consistent with nonaccidental abusive head trauma and severe brain injury.

{¶15} Dr. Ranjit Chima testified that he was one of the physicians in the pediatric

ICU responsible for Hannah's care following her emergency surgery. While in the ICU, Hannah never regained consciousness and her neurological condition deteriorated. After three days, Dr. Chima determined that Hannah was progressing towards brain death. On March 18, 2018, after meeting the criteria for brain death, doctors pronounced Hannah deceased.

{¶16} Dr. Dorothy Dean is a forensic pathologist and performed Hannah's autopsy. She testified for the state as an expert witness in forensic pathology. Dr. Dean noted that Hannah weighed 32 pounds and was 38.5 inches long. After shaving Hannah's hair, Dr. Dean located bruises on the back and right side of Hannah's head. Dr. Dean examined underneath the skin on the back of Hannah's head and located two additional bruises. Dr. Dean further located a bruise in the deep muscle of the neck.

{¶17} Dr. Dean noted that Hannah had "tremendous" hemorrhages in her eyes. Upon examining Hannah's brain, Dr. Dean observed "tremendous" brain swelling and a shearing injury to the brain. Dr. Dean opined that Hannah's cause of death was a traumatic brain injury due to a blunt, tremendous force that went through her brain. A fall from ground level would not cause the injuries observed. Hannah would not have been walking, talking, or behaving in a normal fashion after receiving the injury, and would have been neurologically abnormal and unresponsive "within moments." Dr. Dean opined that Hannah's manner of death was homicide.

{¶18} Dr. Kathi Makoroff, Associate Professor of Pediatrics at the Mayerson Center at Cincinnati Children's Hospital, testified for the state as an expert in child abuse pediatrics. At trial, she reviewed a series of medical file photographs, which were introduced into evidence, depicting the injuries observed on Hannah when she arrived at Children's Hospital. She noted multiple bruises that she found concerning for child abuse including those bruises around Hannah's eyes, left ear, under her chin, her flanks, upper arms, and

buttocks. Given Hannah's overall medical condition, Dr. Makoroff opined that Hannah's injuries were nonaccidental with a diagnoses of child physical abuse and abusive head trauma.

{¶19} Dr. Makoroff further opined that Hannah's injuries were not caused by a fall or multiple falls and that much greater force was involved in causing the injuries. Shaking alone could have caused the injuries that resulted in Hannah's death. Furthermore, Hannah would have been unresponsive after the injury.

{¶20} On cross-examination, defense counsel asked Dr. Makoroff if her opinion testimony about bruises was "about the location and pattern of bruises on Hannah's body." Dr. Makoroff agreed that she testified in that manner as to some of the bruises. Defense counsel then questioned Dr. Makoroff as to whether she had offered an opinion about patterns and locations of bruises in her expert opinion letter, which was provided in advance of trial to the defense. The state objected to this line of questioning and a sidebar ensued. The court ultimately found that Dr. Makoroff's opinion testimony that related to the patterns and locations of bruises was within the scope of the opinion letter.

{¶21} Detective Janee Lambert testified that investigators first questioned Partin in a formal interview on March 8, 2018, which interview was video-recorded and admitted into evidence. In the recording, a detective initially read Partin her *Miranda* rights. Partin indicated she understood her rights and executed a *Miranda* rights waiver form.

{¶22} As the interview began, a detective told Partin that Hannah had died, which was not true at the time. Partin denied any knowledge of what caused Hannah to become unresponsive. She stated that Jason had carried Hannah into the garage that morning. She examined Hannah's face and told Jason that "her face looks good" and "her bruise looks better." Hannah asked Jason for another hug and double kisses before Jason left. Hannah was acting "completely normal," was not acting different, and only acted a little

tired. Hannah told Partin that she wanted "couch and donut" and then fell face forward on to the carpet. It happened within 30 seconds. Partin called Jason first before calling 9-1-1.

{¶23} Later, detectives paused their questioning and left Partin alone in the interview room. During this time, Partin announced aloud, "I am going to prison for the rest of my life." When the interview resumed, Partin told detectives she had seen bruises sometimes on the back of Hannah's head and on her arms. Hannah had also fallen on some gravel on Tuesday, March 6. The next day, Partin had been "trying to make her chin look better" by using vapor rub.

{¶24} Lead Detective Dan Turner testified concerning a second interview with Partin, which he and another detective conducted on March 9, 2018. The second interview was video-recorded and admitted into evidence. Again, Partin was informed of her *Miranda* rights and again waived them in writing.

{¶25} During this interview, Detective Turner produced photographs taken at the hospital of the various external bruising found on Hannah. While reviewing the photographs, Partin reiterated her earlier claims that certain bruises were the result of falling on gravel on Tuesday, March 6 or falling off a toy in Partin's garage on Wednesday, March 7. Partin again denied any knowledge of what caused Hannah to collapse in her home on the morning of March 8.

{¶26} Approximately 50 minutes into the interview, Partin admitted for the first time that something had happened to Hannah in Partin's home on Thursday morning. Hannah had slipped at the entry door between the house and garage and hit her head on a concrete step. Partin said that after the fall, she picked Hannah up and then Hannah said, "I want donut and couch." And then Hannah collapsed.

{¶27} Detectives told Partin that the fall she had just described would not have

caused Hannah's injuries based on what Hannah's physicians were relaying to them and encouraged her to tell the truth. Partin then changed her story. She now stated that "when I opened the door, I dropped her, and I slipped and fell." Partin said she slipped on Hannah's blanket, they both fell, and Hannah hit her head on the metal part of the concrete step. Hannah hit "really hard." Partin showed the detectives a bruise on her hand, which allegedly resulted from the fall.

{¶28} The detectives continued to question Partin and informed her that a fall would not cause the severe injuries suffered by Hannah. Partin then admitted that she "probably shook" Hannah "hard," after the fall, for one minute. Hannah's head was "snapping around." Partin was panicked. She also "probably" dropped Hannah.

{¶29} Partin later modified her story once more and admitted that she shook Hannah *before* the alleged fall. Partin explained that Hannah had been whining because she did not want her father to go to work. Partin shook her, picked her up, squeezed her, then they fell. She shook Hannah again after they fell.

{¶30} Partin admitted that she was frustrated. Hannah had been whining after her father every morning. Partin demonstrated violently shaking Hannah and yelling, "stop doing this already!" Partin admitted that she shook Hannah until she stopped whining.

{¶31} With respect to some of the bruising around Hannah's head, Partin explained that earlier in the week she "slapped" Hannah "upside the head" because Hannah took ketchup and squirted it into the toilet. With regard to the bruise under Hannah's chin, Partin admitted that she twice struck Hannah under the chin. She demonstrated the double-strike with an uppercut-like motion using a martial arts-style clawed fist.

{¶32} With regard to the bruises observed on Hannah's chest, which Partin had earlier claimed were from when Hannah fell on gravel or rocks, Partin confessed that these bruises were from physical discipline. Partin demonstrated aggressively poking Hannah

while yelling "Hannah! You know better!" Partin also demonstrated how she squeezed Hannah around the middle or her body to discipline her. When asked why she would do these things to Hannah, Partin explained that it was because Hannah was mischievous and because Partin was frustrated with personal problems.

{¶33} Jason Wesche testified that he and Hannah lived at 4004 Shank Road, which was about 300 feet from Partin's residence. Partin babysat Hannah during the day, baby sat other children, and took care of her own children. The week of March 4, 2018, he had conversations with Partin about some injuries observed on Hannah. Hannah had bruises all over her chest and a "pretty bad" scrape on the chin. Partin told him that these occurred because Hannah had fallen on rocks in the driveway. On another day, Partin told him that Hannah stepped on top of a toy on wheels and it "kicked from underneath her. And she fell on the handlebar." Hannah had bruising around her eye from this incident.

{¶34} On the morning of March 8, 2018, Jason helped Hannah put on her coat and shoes and at 6:52 a.m., Jason sent Partin a text indicating that they were "getting ready to head over" as he and Hannah left 4004 Shank Road. Partin texted him back "ok."

{¶35} Jason testified that he and Hannah left the home and went to his car. That morning Hannah wanted to lay in the backseat for the drive over. They drove to Partin's residence. Jason estimated that he would have arrived at the Partin residence three minutes after sending the text, or 6:55 a.m. [1]

{¶36} Jason carried Hannah, who was wrapped in a blanket, into Partin's garage and gave Hannah hugs and kisses. That morning was different because Hannah kept asking for more kisses. Then, Partin took Hannah and he walked away. He did not see

---

1. On March 5 and March 6, Jason texted Partin indicating that he was bringing Hannah over, and in those texts, he indicated he would arrive at Partin's home in 3 minutes and 2 minutes respectively.

them enter the home, but they were headed that way.

{¶37} Jason got into his car and then drove down to his work truck located at a business down at the end of Shank Road.[2] He got out of his vehicle, got into his work truck and started it, then got back into his vehicle. He then saw that he had missed a call from Partin. He returned the call and Partin told him there was something wrong with Hannah. Jason then raced back to the Partin residence.

{¶38} Jason also testified about his activities on Wednesday March 7, 2018. That evening, he picked up Hannah from Partin's home at 7:00 p.m. A friend of his, Chris Davis, had stayed at 4004 Shank Road that day. After picking up Hannah, Jason and Hannah drove Chris to Chris' residence in Fairfield, Ohio. Then they returned to 4004 Shank Road and he and Hannah lay on the couch and went to sleep.

{¶39} Jason admitted that at the start of the investigation he told detectives that he had gone to Wal-Mart on the evening of March 7 to get milk for Hannah and that he had not mentioned Chris or travelling to Fairfield. He remembered what had actually occurred after talking with Chris before he was going to testify. He told Detective Turner about this recollection the day before his testimony.

{¶40} The state introduced Partin's cell phone records, which revealed that Jason texted "getting ready to head over" at 6:52:17 a.m. Partin responded, "Ok" at 6:52:55 a.m. Partin then called Jason at 7:00:47 a.m., which call was not answered. Jason returned the call at 7:01:24 a.m. Partin called 9-1-1 at 7:02:51 a.m., which call lasted 13 minutes until emergency responders arrived.

{¶41} On March 7, at 8:48 a.m., Partin used her phone's Google app to search "how

---

2. The record is unclear concerning the distance between the Partin residence and the business. Based on an aerial map of Shank Road introduced into evidence, the business appears to be located less than a quarter mile from the Partin residence.

to get rid of a bruise." This search was found to have been deleted from the phone. The same day, at 2:56 p.m., Partin searched "what essential oil is good for bruises" and "is vaporub good for bruises." These two searches were not deleted. On March 8, at 9:13 p.m., Partin again searched "how to get rid of a bruise." This search was deleted.

{¶42} Partin took the stand in her defense case. She denied causing any harm to Hannah between March 6 and March 8, 2018. She told detectives what she did in the second interview because she wanted to "protect everybody." This was because the detectives were asking about whether Partin's husband or Jason could have harmed Hannah and she did not want anyone to be in trouble.

{¶43} Partin estimated that it took Jason 7 to 8 minutes to arrive after he sent his text at 6:52 a.m. Jason walked in with Hannah wrapped in a blanket. Partin and Jason "chit-chatted" about the snow and vapor rub. She looked at Hannah for "a second" and then told Jason that it looked like the vapor rub "worked." He said "yeah." Hannah stood up, grabbed Partin's hand, and the two walked into the residence. Partin then asked Hannah if she wanted to go to the couch or go to sleep, because Hannah seemed tired. Hannah responded, "donut and couch." She then collapsed. Partin said she had Hannah for ten seconds before she collapsed.

{¶44} Partin said she saw bruising below Hannah's chin on Wednesday morning and put vapor rub and essential oils on it. She assumed it was from when Hannah fell on gravel the day before. Partin admitted that her story about Hannah putting ketchup in the toilet was a lie.

{¶45} On cross-examination, Partin stated that she did not think she would get in trouble for telling detectives that she had hurt Hannah because Jason would "back me up." She confirmed that she did not believe she would be in trouble for poking Hannah in the chest, squeezing her in the middle, hitting her with a closed fist multiple times under the

chin, and shaking her. Partin also confirmed that the story about her falling with Hannah was a lie and she also lied about getting a bruise on her hand from that fall. She told detectives the lie about the bruise on her hand because it "seemed logical at the time."

{¶46} The jury convicted Partin on all six counts. During sentencing the court informed Partin of her duty to register as a violent offender under Sierah's Law. Partin appeals, raising seven assignments of error.

{¶47} Assignment of Error No. 1:

{¶48} THE TRIAL COURT ABUSED ITS DISCRETION AND PREJUDICED THE DEFENDANT WHEN IT ALLOWED AN EXPERT WITNESS FOR THE STATE TO TESTIFY BEYOND THE SCOPE OF THE EXPERT'S REPORT, IN VIOLATION OF CRIM.R 16(K).

{¶49} Partin contends that the trial court abused its discretion by failing to exclude Dr. Makoroff's expert opinion that the "patterns and locations" of bruises on Hannah's body indicated child abuse. Partin claims that Dr. Makoroff's opinion was a new theory of the evidence and had not been disclosed in a written report as required by Crim.R. 16(K). Partin argues the state's failure to disclose Dr. Makoroff's opinion prejudiced her defense because she had no ability to contradict Dr. Makoroff's theory with her own expert opinion or determine whether Dr. Makoroff's opinion was determined within a reasonable degree of medical certainty. Partin claims additional prejudice because the state highlighted Dr. Makoroff's opinion during closing argument.

{¶50} Dr. Makoroff's opinion letter was dated December 14, 2018, and there is no dispute that it was provided to the defense in a timely manner. The letter indicated that Dr. Makoroff had examined Hannah and observed multiple bruises on her face, ear, head, chest, bilateral flanks, back, buttock, bilateral upper extremities, and bilateral lower extremities. Dr. Makoroff further noted hemorrhages in both eyes, as well as subdural

bleeding in the brain, shifting of one part of the brain to the other, and brain swelling. The letter indicated that Hannah's presentation was inconsistent with a fall or even multiple falls and that the severity of her injuries indicated that she would not have been acting normally and would have become symptomatic and nonresponsive shortly after receiving the injury. Ultimately, Dr. Makoroff offered her diagnosis of physical abuse, including abusive head injury.

{¶51} At trial, during direct testimony, Dr. Makoroff reviewed the medical file photographs taken of Hannah that depicted bruising over various parts of her body. Dr. Makoroff indicated those bruises which were of concern to her, including the bruises on the upper and lower eyelids, the bruising underneath the chin, a left ear bruise, bruises on the chest, on the flanks, arms, and buttock. Dr. Makoroff noted that the extent of some bruises made them appear less accidental, and that the bruises had occurred on "multiple planes" of Hannah's body was also very concerning for child abuse and that a couple areas of buttock bruising appeared to have "some pattern to it." Ultimately, in conjunction with the other medical evidence including the injuries to Hannah's eyes and brain, and Hannah's autopsy report, Dr. Makoroff opined, within a reasonable degree of medical certainty, that Hannah's injuries were nonaccidental and her diagnoses were child physical abuse and abusive head trauma.

{¶52} On cross-examination, defense counsel asked Dr. Makoroff if she agreed that her opinion testimony on direct included opinions "about the location and pattern of bruises on Hannah's body." Dr. Makoroff confirmed she had testified in that manner with respect to some of the bruises. Upon further questioning, Dr. Makoroff confirmed that her testimony concerning bruising "was very detailed." Defense counsel then confronted Dr. Makoroff with her opinion letter and asked whether she discussed "patterns of bruises" or "locations of bruises" in her letter. Dr. Makoroff confirmed that she had not used those words but

argued that they were encompassed within her opinion letter.

{¶53} During this questioning, the state objected, and a side-bar discussion ensued. Defense counsel moved to strike Dr. Makoroff's testimony, arguing that it was a new opinion outside of the opinion letter. After hearing argument from both sides, the court indicated that it did not agree that Dr. Makoroff's testimony constituted a new opinion, that Dr. Makoroff had not deviated from her ultimate opinion, and therefore the court would not strike her testimony.

{¶54} Crim.R. 16 governs discovery in criminal proceedings. Crim.R. 16(K) addresses expert witnesses and expert witness reports. The rule provides:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶55} Recently, The Ohio Supreme Court construed Crim.R. 16(K) in an appeal from a murder conviction where the trial court admitted expert opinions not previously disclosed in writing. *State v. Boaston*, Slip Opinion No. 2020-Ohio-1061. In *Boaston*, the state provided the defense with a deputy coroner's autopsy report more than one year prior to the trial. *Id.* at ¶ 38. The autopsy report detailed the coroner's factual findings with respect to the autopsy, including the appearance and weight of the contents of the victim's stomach, but did not include the deputy coroner's opinion as to the victim's time of death based on those findings. *Id.* The report also did not contain a written opinion concerning whether the buckle of a glove found in the defendant's possession could have caused a distinct abrasion found below the victim's chin. *Id.* at ¶ 39.

{¶56} The deputy coroner met with defense counsel 19 days before trial and shared her opinions as to time of death and as to the consistency between the glove buckle and abrasion. *Id.* at ¶ 40. Defense counsel then suggested that the state file a supplemental report, but the state did not. *Id.*

{¶57} At trial, defense counsel moved to exclude the deputy coroner's opinion testimony for the failure to file a written report containing the expert's opinion within 21 days of the trial as required by Crim.R. 16(K). *Id.* at ¶ 41. The trial court overruled the objection and permitted the opinion testimony, noting that the defense had the autopsy report well before trial and that defense counsel had chosen to meet with deputy coroner 19 days before trial. *Id.* The court of appeals affirmed based partially on the trial court's broad discretion concerning the admission of evidence. 2017-Ohio-8770, ¶ 49.

{¶58} The Ohio Supreme Court reversed. The court found that the autopsy report "did not contain all the opinions that the state ultimately sought to elicit from the deputy coroner at trial." *Id.* at ¶ 47. The court proceeded to construe whether Crim.R. 16(K) required the exclusion of the deputy coroner's testimony, which went beyond that contained in the autopsy report. *Id.*

{¶59} The court noted that the underlying purpose of Crim.R. 16(K) was to "'avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report.'" *Id.* at ¶ 48, quoting *State v. Perry,* 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 55. Next, the court found a split within the courts of appeals as to the effect of noncompliance with Crim.R. 16(K). *Id.* at ¶ 51. This court and others have found that a trial court retained discretion to admit expert opinion testimony despite technical noncompliance with Crim.R. 16(K). *Id., citing State v. Retana,* 12th Dist. Butler No. CA2011-12-225, 2012-Ohio-5608, ¶

53-54. Other courts of appeals concluded that Crim.R. 16(K) removed a trial court's discretion and mandated the exclusion of opinion evidence when a written report had not been disclosed in accordance with the rule. *Id.* at ¶ 52.

{¶60} Ultimately, the Ohio Supreme Court held that the plain language of Crim.R. 16(K) dictated the result: "[f]ailure to disclose the written report to opposing counsel *shall preclude* the expert's testimony at trial." (Emphasis added.) *Id.* at ¶ 55. The court held that it was error to allow opinion testimony that "went beyond the scope" of the autopsy report. *Id.* at ¶ 58. The court then proceeded to examine the issue under a harmless-error analysis and determined that the error in Boaston's case did not require reversal under Crim.R. 52. *Id.* at ¶ 70.

{¶61} *Boaston* is distinguishable. Unlike the deputy coroner's autopsy report, which contained only factual findings, Dr. Makoroff's opinion letter contained both the facts upon which she relied, and the opinion derived from those facts, within a reasonable degree of medical certainty. Dr. Makoroff's testimony at trial also did not go beyond the scope of her opinion letter or her medical notes. Dr. Makoroff's opinion letter and notes of her medical exam indicated with specificity each and every location where she noted bruising on Hannah's body. Her opinion letter indicated that these observations, in conjunction with Hannah's other medical conditions, led to her opinion that Hannah was the victim of child physical abuse. It was only on cross-examination that defense counsel characterized Dr. Makoroff's opinion as focusing on "locations" and "patterns" of the bruises as indicative of child abuse.

{¶62} Dr. Makoroff's trial testimony added some detail to the summary nature of the opinion letter. However, Crim.R. 16(K) only requires a summary of the expert opinion. And Dr. Makoroff's testimony at trial explaining her opinion was not such an elaboration that it could be said to have caused unfair surprise. In this regard, the defense was aware that

Dr. Makoroff believed that the extent of bruising on Hannah was indicative of nonaccidental child abuse. The defense therefore could have sought an expert to testify as to a nonabusive cause of the extensive bruising found on Hannah's body.

{¶63} And even if this court were to instead find that Dr. Makoroff's testimony went beyond the scope of her opinion letter, for the reasons discussed more fully in response to the fifth assignment of error, any error would be harmless. Multiple other physicians submitted corroborating expert opinions as to the nonaccidental nature of Hannah's injuries. And the state submitted significant other evidence inculpating Partin in the offenses, most notably through Partin's own statements. This court overrules Partin's first assignment of error.

{¶64} Assignment of Error No. 2:

{¶65} THE STATE VIOLATED CRIM.R. 16 AND PREJUDICED THE DEFENDANT WHEN IT FAILED TO DISCLOSE INFORMATION THAT IT HAD KNOWLEDGE THAT ANOTHER INDIVIDUAL WAS WITH [HANNAH] HOURS BEFORE SHE COLLAPSED FROM INTERNAL INJURIES, AND THAT IT KNEW [HANNAH'S] FATHER HAD LIED TO INVESTIGATORS FOR OVER A YEAR.

{¶66} Partin argues that the state violated the criminal discovery rules and prejudiced her right to a fair trial when it failed to disclose that Jason lied to detectives about his whereabouts on the evening of March 7, 2018, and that a friend, Chris, was at his home on March 7, 2018. Partin asks that this court reverse her conviction and remand for a new trial.

{¶67} At trial, the evidence revealed that Jason initially told investigators that he and Hannah went to Wal-Mart on the evening of March 7, 2018 and purchased milk. However, detectives found no milk in the Wesche home. Detective Turner testified that he noted this discrepancy early in the investigation. Upon further investigation, detectives found no

evidence that Jason had travelled to Wal-Mart that evening. Detective Turner testified that he subsequently determined that the discrepancy was not an issue, that Jason had not lied, but also that he had not gone to Wal-Mart or purchased milk that evening.

{¶68} When Jason testified, he explained that he recalled telling detectives that he had gone out to purchase milk but explained that he was confused at the time. He had meant to get milk but had not. Two days prior to his testimony, after speaking with Chris, Jason recalled that Chris was staying at his home on March 7, 2018.

{¶69} Jason then recalled that on the evening of March 7, he picked up Hannah from Partin's house at around 7:00 p.m. He and Hannah then drove Chris back to Chris' home in Fairfield. It took approximately one hour to drive to Fairfield, drop Chris off, and drive back.[3] Jason testified that he told Detective Turner about his recollection about Chris Davis and his activities that evening for the first time on April 8, 2019, or the day before his testimony for the state.

{¶70} Partin does not cite which provision of Crim.R. 16 the state allegedly violated but presumably she refers to Crim.R. 16(B)(5), which requires that the prosecutor, upon written demand, provide copies of "[a]ny evidence favorable to the defendant and material to guilt or punishment * * *." And with respect to discovery violations in criminal proceedings, Crim.R. 16(L)(1) provides:

> The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

---

3. Jason's claim as to his travel that evening was corroborated by a neighbor who lived on Shank Road and testified that she observed that Jason's car was not parked at 4004 Shank Road when she drove by at 8:00 p.m., but was parked at 8:40 p.m.

{¶71} Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995).

{¶72} At trial, Partin did not raise any issue of a willful failure to disclose by the state, nor is there any evidence in the record to support such an assertion. Partin argues that foreknowledge that Jason had not gone to Wal-Mart and instead had taken Chris home, and that Chris had been at 4004 Shank Road on March 7, 2018, would have benefitted her defense because it would have led to a significantly different trial strategy. Presumably, Partin is arguing that she would have modified her trial strategy to expand the list of alternative suspects to include Chris.

{¶73} However, the presence of Chris at 4004 Shank Road on March 7, 2018 was inconsequential given the evidence in this case. Both Partin and Jason testified that Hannah was acting completely normal that morning.[4] The medical evidence established that Hannah would not have been walking, talking, kissing and hugging, and otherwise acting normally after receiving the injuries that led to her death. The evidence overwhelmingly established that the injuries suffered by Hannah had to have occurred in the short window of time after Jason left Hannah with Partin. Thus, the medical evidence, and Partin's own statements, served to exonerate both Jason and Chris as potential suspects. For these reasons, this court finds that the information concerning Jason's whereabouts on March 7 or that Chris was staying at the home on March 7, was immaterial

---

4. In fact, in every version of events relayed by Partin to emergency responders and investigators, Hannah was acting normal upon her arrival at 4050 Shank Road.

and had no prejudicial effect on Partin's substantial rights. Consequently, this court overrules Partin's second assignment of error.

{¶74} Assignment of Error No. 3:

{¶75} THE DEFENDANT RECEIVED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶76} Partin argues that her attorneys provided her with constitutionally deficient legal representation where they failed to move to suppress her interviews with investigators and failed to object or move for a continuance when the undisclosed information about Jason's whereabouts and Chris Davis was revealed during Jason's testimony. To prevail on a claim of ineffective assistance of counsel, Partin must show her trial counsels' performance was deficient and that the deficient performance prejudiced her defense. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 49; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). Trial counsel's performance will not be deemed deficient unless it fell below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, Partin must establish that, but for her trial counsels' errors, there is a reasonable probability that the result of her trial would have been different. *Id.* at 694. The failure to satisfy either prong of the *Strickland* test is fatal to an ineffective assistance of counsel claim. *Clarke* at ¶ 49. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Burns*, 12th Dist. Clinton No. CA2013-10-019, 2014-Ohio-4625, ¶ 7.

{¶77} Partin argues that her attorneys' trial strategy focused on the alleged "coercive nature" of the second interview. Partin contends that despite this strategy, her attorneys did not move to suppress the interview on the grounds that her confession was obtained through coercive police tactics. Partin argues that her admissions in the interview were a

key aspect of the state's case against her and therefore there is a substantial likelihood of a changed outcome at trial if the court had excluded the interview.

{¶78} In support of this argument, Partin cites case law standing for the general proposition that confessions obtained through threatening or coercive police tactics are unconstitutional. However, Partin does not articulate how *her* interview was coercive or present any argument indicating why a motion to suppress in her case would have been successful.

{¶79} This court has reviewed the recording of the second interview and does not agree that the detectives acted coercively in obtaining Partin's confession. The detectives informed Partin of her *Miranda* rights at the beginning of both interviews and she executed *Miranda* waiver forms indicating she understood her right not to speak to investigators. While the two detectives repeatedly pressed Partin to tell them the truth about what happened that morning and informed her that her version of events did not match what Hannah's doctors were informing them, neither the detectives' behavior nor demeanor escalated to anything approaching threatening or coercive. To the contrary, both detectives used the tactic of conveying sympathy and understanding as to why Partin may have been so frustrated with Hannah's "mischievous" behavior, and with personal problems in Partin's life, that she could have harmed Hannah. Partin's eventual confessions to acts harming Hannah were detailed and were not the product of suggestion, coercion, or threatening law enforcement tactics.

{¶80} In addition, Partin testified that she gave the detectives a false confession in order to "protect everyone." She did not claim that she gave a false confession because the two detectives coerced her. For the foregoing reasons, Partin has not demonstrated that her attorneys provided constitutionally deficient legal assistance based upon an alleged failure to file a motion to suppress her interview.

{¶81} Next, Partin argues that her attorneys provided ineffective assistance by failing to object to Jason's testimony about his whereabouts on March 7 and Chris Davis. Partin argues that Jason's testimony should have been objected to immediately for the same reasons set forth in the second assignment of error and that trial counsel should have sought a continuance of the trial. Partin argues that the disclosure that another individual was staying with Jason and Hannah at 4004 Shank Road on March 7, 2018, could have substantially affected the defense theory of the case.

{¶82} However, for the same reasons discussed in response to Partin's second assignment of error, whether Jason drove to Wal-Mart or drove with Chris and Hannah to Fairfield, and whether Chris stayed at the home on March 7 was ultimately immaterial to the state's case. Consequently, Partin cannot demonstrate any reasonable probability of a changed outcome at trial but for her attorneys objecting to Jason's testimony, or seeking a continuance. This court overrules Partin's third assignment of error.

{¶83} Assignment of Error No. 4:

{¶84} THE PROSECUTION PRESENTED INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING THAT THE DEFENDANT WAS GUILTY OF CHILD ENDANGERING, INVOLUNTARY MANSLAUGHTER, AND MURDER.

{¶85} Partin argues that the state presented insufficient evidence to support her convictions. A sufficiency of the evidence challenge involves the determination of whether the conviction can be supported as a matter of law. *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, ¶ 13. The standard of review for a sufficiency of the evidence challenge is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, ¶ 15.

Inference Stacking

{¶86} Partin argues that her convictions on all six counts resulted from impermissible inference stacking. "Impermissible inference stacking" involves drawing an inference based entirely upon another inference, unsupported by any additional facts or another inference derived from facts. *State v. Braden*, 12th Dist. Preble No. CA2013-12-012, 2014-Ohio-3385, ¶ 12. The rule is "extremely limited" and does not prohibit drawing parallel inferences in combination with additional facts or drawing multiple, separate inferences from the same facts. *Id.* at ¶ 12-13.

{¶87} With respect to counts one and two, i.e., the child endangering counts alleged to have occurred between March 6 and 7, 2018, Partin argues that because Jason testified that Hannah told him about falling on gravel, the jury then had to infer that Hannah lied to Jason about falling. Partin also argues the jury had to infer the bruises on Hannah's body were from Partin committing acts of torture or cruel abuse, or excessive corporal punishment.

{¶88} The jury did not have to stack inferences to conclude that Partin committed acts of torture, cruel abuse, or excessive corporal punishment against Hannah between March 6 and 7, 2018.[5] During the second interview, Partin confessed to physically disciplining Hannah with a slap "upside the head." She demonstrated two forceful uppercut motions to Hannah's chin with her fist in a clawed position. Partin further demonstrated aggressively poking Hannah's chest. The state submitted sufficient evidence of acts of torture, cruel abuse, and excessive corporal punishment for purposes of Partin's convictions on counts one and two.

{¶89} With respect to the remaining counts, Partin argues that the jury had to infer that Hannah's brain injuries occurred in the brief time she was in Partin's care that morning

---

5. R.C. 2919.22(B)(2) and (B)(3).

and not while she was in Jason's care, that the jury had to further infer that Jason was telling the truth that Hannah was healthy before being dropped off with Partin, and that the jury had to further infer that Partin was so angry and distraught over her personal circumstances that she "snapped" and caused fatal trauma to Hannah. However, none of these potential conclusions by the jury would require the impermissible stacking of inferences. The jury could find from Jason's and Partin's testimony that Hannah was walking, talking, and acting normally when dropped off by Jason. The jury could conclude that Hannah's injuries occurred while in Partin's care given the medical evidence and Partin's admissions. Finally, the jury could accept Partin's statements during the second interview concerning her mind state to explain her motivation in harming Hannah that morning.

### Count Three – Child Endangering

{¶90} Partin argues that the state submitted insufficient evidence to convict her of count three, i.e., child endangering in violation of R.C. 2919.22(A), alleged to have occurred on March 8, 2018. On this count, the state had to prove that Partin, as a person having custody or control, or person in loco parentis of a child under eighteen years of age, created a substantial risk to the health or safety of Hannah, by violating a duty of care, protection, or support.

{¶91} Partin does not articulate which element of the offense she claims that the state failed to submit sufficient evidence to prove. Instead, she states that Hannah was at her home for approximately two minutes before Hannah collapsed and that she immediately contacted Jason. The state submitted sufficient evidence to support this count. Partin admitted to detectives that in the brief time she had Hannah, she shook her until she stopped whining, squeezed her, and dropped her, and then shook her again, all of which a rational factfinder could find created a substantial risk to Hannah's health and safety.

### Count Four – Involuntary Manslaughter

{¶92} Partin argues that the state submitted insufficient evidence of involuntary manslaughter when it could not prove how Hannah's injuries occurred. The state was required to prove that Partin caused Hannah's death as a proximate result of Partin committing or attempting to commit a felony. R.C. 2903.04(A). Partin argues that the state "admitted it did not know how the internal brain injuries occurred" during closing argument, and therefore the state failed to put on any evidence of causation.

{¶93} The state presented sufficient medical evidence establishing the cause of Hannah's death, which Dr. Dean described as a tremendous force that went through Hannah's brain, causing a shearing injury and traumatic brain injury. The state's other expert witness testified that Hannah's injuries were nonaccidental, child physical abuse, and that shaking alone could have caused the injuries. Partin admitted shaking Hannah, among other acts. The foregoing constituted sufficient evidence to allow rational factfinders to find that Partin caused Hannah's death by engaging in acts constituting felony child endangering on March 8, 2018.

### Count Five – Child Endangering

{¶94} For this count, the state was required to prove that Partin abused Hannah on March 8, 2018, which abuse resulted in serious physical harm. R.C. 2919.22(B)(1) and (E)(1)(d). Partin reiterates the same argument concerning causation set forth in the prior section on involuntary manslaughter. For the reasons discussed previously, the state put on sufficient evidence to permit a rational trier of fact to conclude that Partin abused Hannah, which abuse caused serious physical harm, i.e. Hannah's death.

### Count Six – Murder

{¶95} For this final count, the state was required to prove that Partin caused Hannah's death as the proximate result of committing an offense of violence that is a felony of the first or second degree (count five, child endangering, a second degree felony). Again,

Partin reiterates her argument that the state failed to put on sufficient evidence of causation. For the same reasons stated before, this court finds that the state submitted sufficient evidence to allow a factfinder to conclude that Partin was guilty of murder. This court overrules Partin's fourth assignment of error.

{¶96} Assignment of Error No. 5:

{¶97} THE DEFENDANT'S CONVICTIONS FOR CHILD ENDANGERING, INVOLUNTARY MANSLAUGHTER, AND MURDER WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶98} Partin argues that the greater weight of the evidence supported a not guilty verdict on all six counts. Partin contends that Jason testified that he had no concerns with Partin as Hannah's caregiver, that he had seen bruises on Hannah's body, and that Hannah told him the bruises were from falling. Partin further argues that the narrow time frame and the state's lack of evidence as to the precise mechanism of Hannah's injury demonstrated a lack of credibility in the state's evidence. Partin also points to evidence indicating that Hannah exhibited "uncommon behavior" on the morning of March 8, including climbing into the back of Jason's vehicle and asking for additional hugs and kisses from her father. Finally, Partin argues that Jason's testimony that he had not gone to Wal-Mart and had a friend staying with him the day before Hannah's collapse created an inference that Hannah was suffering from internal injuries before she arrived at Partin's home that morning.

{¶99} In determining whether a conviction is against the manifest weight of the evidence, the appeals court reviews the trial record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Cummings*, 12th Dist. Butler No. CA2006-09-224, 2007-Ohio-4970, ¶ 12. While an

appellate court considers the credibility of the witnesses and the weight to be given the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence presented." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 25, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). The discretionary power to overturn a conviction based on the manifest weight of the evidence is to be invoked only in those extraordinary circumstances to correct a manifest miscarriage of justice where the evidence presented weighs heavily in favor of acquittal. *Id.*

{¶100} This is not a case where the evidence weighed heavily in favor of acquittal. Even by Partin's own varying accounts of what occurred that morning, Hannah arrived at 4050 Shank Road in a normal condition. Partin even observed that Hannah appeared better than she had the day before. That Hannah decided she wanted to ride in the back seat of Jason's vehicle and give her father extra affection does not indicate "uncommon behavior" that would call into question the credibility of the state's evidence.

{¶101} After Hannah collapsed, Partin repeatedly disclaimed any knowledge of anything happening to Hannah inside the Partin residence. However, the medical evidence, presented through multiple expert opinions by physicians of various specialties, demonstrated that Hannah had to have suffered traumatic, violent injuries in the time between when Jason left the garage and when Partin called Jason to report that something was wrong with Hannah. And while that window of time was brief, the evidence did not indicate that the injuries that occurred to Hannah would have taken a substantial time to complete. Hannah's final accounting to detectives of what occurred that morning would fit within the probable time frame. In this regard, Partin confessed in detail to shaking, squeezing, and dropping Hannah because she was frustrated at Hannah's regular behavior of whining as her father left for work. Partin further confessed to physically abusing Hannah

on the days leading up to March 8.

{¶102} Other actions taken by Partin during the investigation further implicated her. From the onset, Partin made certain to inform the 9-1-1 dispatcher, emergency responders, and detectives, that Hannah "fell pretty bad yesterday." During the interview, Partin repeatedly altered her story about what happened to Hannah and later claimed she lied about detailed aspects of the abuse perpetrated on Hannah. Partin twice deleted internet searches for "how to get rid of a bruise." And while alone in the interview room on March 8, before detectives had confronted her with the opinion of the medical experts, and before Partin had made any inculpatory statements to detectives, Partin announced to herself that she was going to prison for the rest of her life. Partin's convictions were supported by the greater weight of the evidence. This court overrules Partin's fifth assignment of error.

{¶103} Assignment of Error No. 6:

{¶104} THE RETROACTIVE APPLICATION OF THE VIOLENT OFFENDER REGISTRATION REQUIREMENT TO THE DEFENDANT'S CASE VIOLATES THE EX POST FACTO CLAUSE AND THE OHIO CONSTITUTION.

{¶105} Partin argues that the court violated her federal and Ohio constitutional rights by informing her of her duty to register under the violent offender registration scheme set forth in R.C. 2903.41 through 2903.44, also known as Sierah's Law. Partin argues that the current version of R.C. 2903.41 did not exist when she was indicted, and therefore the application of Sierah's Law during sentencing violated her rights.

{¶106} After the parties filed their briefs in this case, this court issued an opinion in another case addressing an identical argument. *State v. Hubbard*, 12th Dist. Butler No. CA2019-05-086, 2020-Ohio-856, appeal accepted, 159 Ohio St.3d 1427, 2020-Ohio-3473. In *Hubbard*, this court determined that the General Assembly plainly intended for Sierah's Law to apply to conduct occurring before the statute's effective date and that the statute

was remedial, not substantive, and therefore passed constitutional muster. *Id.* at ¶ 24, 37. As of the date of this opinion, the Ohio Supreme Court has not issued an opinion on the *Hubbard* appeal. This court does not find any cause to reconsider the precedent set forth in *Hubbard*. Accordingly, this court overrules Partin's sixth assignment of error on the basis set forth in *Hubbard*.

{¶107} Assignment of Error No. 7:

{¶108} THE CUMULATIVE EFFECT OF ERRORS IN DEFENDANT'S TRIAL DEPRIVED HER OF A FAIR TRIAL.

{¶109} Partin argues that if this court determines that the errors that occurred in her trial were harmless, then the cumulative effect of all the errors deprived her of a fair trial and her conviction should be reversed. For the reasons discussed in response to Partin's first through sixth assignments of error, this court does not find error in Partin's trial and does not find that she was deprived of a fair trial. This court overrules Partin's seventh assignment of error.

{¶110} Judgment affirmed.

M. POWELL, P.J., and PIPER, J., concur.