[Cite as *State v. Clifton*, 2026-Ohio-2122.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2025-03-003 |
| vs. | : | OPINION AND JUDGMENT ENTRY 6/8/2026 |
| NOAH STEVEN CLIFTON, | : | |
| Appellant. | : | |
| | : | |

CRIMINAL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. CRI2023-2163

Zachary A. Corbin, Brown County Prosecuting Attorney, and Mary McMullen, Assistant Prosecuting Attorney, for appellee.

Elizabeth Miller, Ohio Public Defender, and Max Hersch, Assistant Public Defender, for appellant.

**O P I N I O N**

**BYRNE, P.J.**

{¶ 1} Noah Steven Clifton appeals from his convictions for aggravated murder and attempted murder in the Brown County Court of Common Pleas. Clifton alleges that he received ineffective assistance of counsel when counsel failed to move for a

competency evaluation prior to and during his trial. For the reasons discussed below, we affirm Clifton's convictions.

## I. Factual and Procedural Background

{¶ 2} On September 20, 2023, Clifton's grandparents and his cousin were watching television at the grandparents' home, where they lived with Clifton. Clifton emerged from his bedroom and shot his grandfather in the head with a pistol, killing him. Clifton then shot his grandmother multiple times and shot his cousin. Clifton's grandmother and cousin survived. Law enforcement arrested Clifton outside of the home. These facts are largely undisputed and not directly at issue in this appeal.

{¶ 3} A grand jury indicted Clifton on various counts of murder, attempted murder, aggravated murder, attempted aggravated murder, and felonious assault, all with firearm and forfeiture specifications. On October 5, 2023, the trial court conducted an arraignment and Clifton pleaded not guilty. The court set a bond of $1,000,000.00.

### A. Incompetency Raised

{¶ 4} On October 9, 2023, Clifton, through counsel, filed a suggestion of incompetency, which alleged that Clifton was not competent to stand trial pursuant to R.C. 2945.37. On the same day, counsel filed a written plea of not guilty by reason of insanity ("NGRI"). In response to defense counsel's motion, the court issued an order for Clifton to be evaluated for competency to stand trial and for his NGRI plea.

### B. First Competency Evaluation

{¶ 5} On November 28, 2023, a psychologist, Dr. Emily Davis, conducted a competency evaluation with Clifton. She subsequently issued a written report detailing her conclusions. Her report indicated that the evaluation took place in person at the Brown County Detention Center and the interview lasted approximately one hour.

{¶ 6} Dr. Davis reported that Clifton had agreed to participate in the competency evaluation. However, Clifton declined to participate in the NGRI evaluation.

{¶ 7} Dr. Davis' report included her description of "collateral" sources of information she obtained to render an opinion. These sources included medical records from Clifton's recent hospitalizations for mental health issues and an interview with Clifton's mother. According to Dr. Davis, these sources demonstrated an escalation of mental health instability that Clifton began experiencing in 2022. Specifically, Clifton began exhibiting paranoid behaviors and a belief that other individuals, mostly family members, had a malicious intent towards him.

{¶ 8} These mental health issues were documented across several hospital evaluations and admissions. Clifton was admitted to University Hospital between October 8, 2022, and October 19, 2022. During this admission, he was observed to be paranoid and guarded when attempts were made to gain insight into his experiences. Clifton attributed his behavior to being "really high from a vape" but there were genuine concerns that he was responding to internal stimuli. This hospital admission was perceived to be his first psychotic break, and he was diagnosed with schizophrenia by the time of his discharge.

{¶ 9} The next note from University Hospital was written on December 7, 2022. Clifton's father had called for mobile crisis assistance and was expressing concerns that Clifton was not taking his prescribed psychotropic medication. At that time, hospitalization was not recommended because Clifton was not exhibiting clear signs of psychosis.

{¶ 10} Clifton was next admitted to Mercy Hospital Clermont between December 31, 2022, and January 5, 2023. He was brought to the hospital by police after the police were called to Clifton's grandparents' house. There were reports that Clifton was

hallucinating and stating that there were demons in the house. He was reported to be "poking" his grandfather in the face and there were fears of potential violence.

{¶ 11} At the hospital, Clifton was evasive and guarded and would not submit to any urinalysis or blood screen. He admitted regular use of marijuana and Delta 8. He was admitted and diagnostic impressions continued to be that of schizophrenia. Notes indicated that he appeared "good at hiding his illness." His mother had expressed concerns to staff that she found journal entries in which Clifton believed there was a demon in his grandfather. The journal writing also talked about God, communications he believed he had with God, and a belief that it was his mission to die.

{¶ 12} Clifton was evaluated a second time at Mercy Hospital Clermont on January 17, 2023. At that time, he was not admitted because he was not showing active symptoms of psychosis. He was instead recommended to be connected to an outpatient program for intensive support. However, he returned to the hospital on February 6, 2023, and was admitted and stayed in the facility until February 13, 2023.

{¶ 13} This hospital admission occurred after Clifton's father contacted mobile crisis with a report that Clifton had grabbed a knife and had intentions to kill himself. During the admission, Clifton was exhibiting delusional beliefs including that a woman who was living with his father was a "Satanist," was conjuring spirits, and she was using her powers to influence both him and his father. Clifton stated that similar events occurred when he had lived with his grandparents two months prior, and Clifton identified his grandfather as a Satanist. Clifton was not obviously responding to internal stimuli during this hospital stay, but it was noted that he believed that his delusions were genuine. A diagnosis of schizophrenia was listed at the time of his discharge.

{¶ 14} Clifton was admitted to Mercy Hospital Clermont for a third time between March 14, 2023, and March 18, 2023. He was brought to the facility by police after multiple

people had called with concerns. This included a report that he had been found at the Hilton Hotel looking into windows and acting bizarrely. He had also been seen at a Kroger grocery store and was telling people that they were demons and reporting concerns that there were dead bodies in a shipping crate. When police arrived, he became combative and made threats to kill himself. His behavior at the hospital was observed to be paranoid and delusional.

{¶ 15} As documented through these medical records, Clifton had been diagnosed with schizophrenia and was exhibiting paranoid and delusional beliefs that his family members were conspiring against him, were "Satanists," and were involved in mind control. Clifton was also engaging in homicidal ideation with respect to his family. However, Clifton had no insight into his illness and had refuted the diagnoses offered him and had refused medications or treatment. Instead, Clifton had blamed these episodes on his abuse of THC products.

{¶ 16} Dr. Davis noted that while incarcerated and awaiting trial, Clifton had refused to speak with the jail's mental health staff and had refused the psychotropic medication offered to him.

{¶ 17} During the interview, Clifton offered Dr. Davis some "basic" historical information but also demonstrated poor insight and understanding into his symptoms of paranoid and delusional beliefs. Clifton also exhibited ongoing delusional beliefs when he told Dr. Davis that some individual had paid his million-dollar bond and that he had already "bonded out" of jail. When asked who had paid his bond, he refused to identify the person and was guarded.

{¶ 18} Dr. Davis found that Clifton was able to demonstrate his understanding of basic judicial concepts, such as correctly describing aspects of the trial process and those individuals who would be involved in the trial. Nonetheless, it was Dr. Davis' opinion that

Clifton's paranoid and delusional beliefs were continuing and "driving" him to refuse to engage with jail staff and his attorneys.

{¶ 19} Dr. Davis opined, within a reasonable degree of psychological certainty, that Clifton was capable of understanding the nature and objective of the proceedings against him but was not currently capable of assisting in his defense. Clifton's paranoid and delusional thinking was the primary reason for Dr. Davis' opinion, and this thinking was resulting in his refusal to engage with his attorneys. Furthermore, Dr. Davis felt that given his paranoid and delusional beliefs, Clifton might engage in inappropriate behaviors during judicial proceedings.

{¶ 20} Ultimately, Dr. Davis opined that Clifton was incompetent to stand trial but was capable of being restored to competency after a course of treatment. Dr. Davis recommended that Clifton be referred to Summit Behavioral Healthcare ("SBH") for inpatient treatment.

### C. First Competency Hearing

{¶ 21} After receiving Dr. Davis' report, the court held a competency hearing in December 2023. Based on the report, the court found that Clifton could not assist in his defense and was therefore incompetent to stand trial. The court found that Clifton was capable of being restored to competency and ordered him transported to SBH for treatment. The court scheduled a hearing in April 2024 to reassess Clifton's competency to stand trial.

### D. Second Competency Evaluation

{¶ 22} In April 2024, prior to the second competency hearing, Dr. Charles Lee, a psychologist at SBH, sent the court a written report indicating that Clifton had been restored to competency.

{¶ 23} In the report, Dr. Lee described Clifton as communicating well. Clifton relayed some confusion and when asked about why he was confused, he stated that he had been told by his father and some correction officers that he had bonded out of jail.

{¶ 24} Regarding his mental health treatment, Clifton reported to Dr. Lee his belief that he had been diagnosed with "psychosis due to cannabis use." He admitted four or five previous mental health visits but stated that they were due to "family things." He admitted a prior diagnosis of schizophrenia but said that "they took it away" and indicated it was based "strictly off family testimony." He indicated he was currently prescribed no psychotropic medications at SBH. Clifton reported to Dr. Lee that he had never experienced any auditory or visual hallucinations.

{¶ 25} While Dr. Lee did not perform a formal assessment of intelligence, he found that Clifton did not present as cognitively challenged and his use of vocabulary and reported level of education indicated as much. When asked why he had been referred to SBH, Clifton responded "RTC" (referring to restoration to competency) and said he thought it was because of an interview that lasted 20 minutes by someone who deemed him incompetent. Dr. Lee reported that Clifton readily agreed to participate in the interview and seemed eager for his case to move forward and viewed this evaluation as a step in that direction.

{¶ 26} Dr. Lee wrote that Clifton was able to describe his childhood, his schooling through high school and two semesters of college, and his employment history during high school and after leaving college.

{¶ 27} Clifton stated that he began using THC at the age of 18 and that he had used THC in "a lot" of variations, including flower, dabs, wax, Delta 8, and Delta 9. He described his use as "erratic" and indicating he had periods of use interspersed with periods of abstinence.

{¶ 28} At SBH, Clifton exhibited generally cooperative behavior. Clifton's initial diagnostic impressions by staff at SBH were an unspecified psychotic disorder and cannabis use disorder. His treatment plan considered that his presentation could be characteristic of a substance-induced psychotic disorder due to the reported use of Delta 8 and Delta 9.

{¶ 29} Dr. Lee noted Clifton had previously been psychiatrically hospitalized with fairly consistent diagnoses of schizophrenia, as documented by Dr. Davis in her evaluation. However, Dr. Davis' summary also noted that Clifton acknowledged using THC substances prior to these hospital admissions and he tested positive for THC on at least one occasion when admitted to University Hospital Medical Center.

{¶ 30} Dr. Lee wrote that during the course of his hospitalization at SBH, Clifton had not exhibited overt signs or symptoms of an active mental disorder. And he was currently prescribed no psychotropic medications, and there was no need for such medication at this point.

{¶ 31} Regarding competency, Clifton was able to correctly convey his understanding of the legal proceedings, the charges against him, the individuals involved in the trial, and the trial process. He was able to describe what would be appropriate behavior in a courtroom, such as not shouting, not overreacting, and speaking when spoken to. He knew to tell his lawyer if incorrect testimony was offered in court. Clifton had participated in multiple group sessions related to restoring competency and had done well in these sessions.

{¶ 32} Throughout the interview, Clifton interacted with Dr. Lee in a polite and well-oriented manner and was able to make himself clearly understood. Dr. Lee opined that Clifton had the capacity to relate in a similar manner with his attorneys. Furthermore, Dr. Lee opined that Clifton would have the capacity to challenge prosecution witnesses,

testify relevantly, and had the capacity to understand instructions. He knew how to behave appropriately in court and was motivated for a favorable outcome. Dr. Lee further opined that Clifton had the capacity to tolerate the stress of a trial or hearing.

{¶ 33} Dr. Lee therefore opined that Clifton was not currently mentally ill and no longer required inpatient mental health care. He was capable of assisting in his defense and was competent to stand trial.

**E. Second Competency Hearing, Request for Third Competency Evaluation, and Discussion of Bond Status**

{¶ 34} After receiving Dr. Lee's report, the court held a second competency hearing on April 19, 2024. The court found that based on Dr. Lee's report, Clifton had been restored to competency and ordered him to be returned to jail from SBH.

{¶ 35} At the hearing, Clifton's counsel requested a third evaluation on competency, and the court granted that motion. Clifton's counsel also indicated that Clifton had refused to comply with a NGRI evaluation at SBH but that counsel wished to proceed with that evaluation, nonetheless. The court ordered an NGRI evaluation.

{¶ 36} On April 30, 2024, the court held a hearing. The court indicated it had learned that Clifton did not want to be evaluated for NGRI. Counsel for Clifton confirmed that Clifton had made it clear that he did not desire to be evaluated for NGRI. Counsel indicated that they were confident that this was a decision Clifton wanted to make. Counsel indicated that they did not agree with Clifton's decision, but it was his choice. The court subsequently issued an order withdrawing Clifton's plea of not guilty by reason of insanity.

{¶ 37} At the conclusion of the April 30 hearing, Clifton spoke to the court, asking about the status of his bond. He indicated that he was told that he had bonded out but that he had also been told he was not bonded out. He was confused. The court told Clifton

that his bond was set at $1,000,000 and the court's records indicated it had never been posted. Clifton indicated he understood.

## F. Third Competency Evaluation

{¶ 38} The third competency evaluation was performed by Dr. Lisa Foulk on May 26, 2024. Dr. Foulk's written report indicated that she met with Clifton at the Brown County Detention Center for approximately four hours for the evaluation.

{¶ 39} Dr. Foulk indicated that when she arrived at the jail, she was informed that Clifton was in his cell and had declined to meet with her and would not leave his cell. She asked to speak to him and was permitted to do so. Clifton told her he would not participate in a "competency and sanity evaluation." She explained that the evaluation was to determine his competency to stand trial, and not a sanity evaluation. Clifton then agreed to meet with her.

{¶ 40} During the interview, Clifton presented coherent, appropriate thought content and stayed focused. He did not demonstrate any active paranoid or delusional thoughts. He presented no cognitive impairment or memory issues.

{¶ 41} Clifton denied currently experiencing any type of hallucination, including auditory or visual hallucinations. He admitted having experienced hallucinations in the past related to his substance use but denied hallucinations in any form outside of when he was using substances.

{¶ 42} Regarding competency, Clifton had no problem identifying his charges and the potential penalties he faced. He accurately named and defined each plea option. He could name and knew the role of each participant within a courtroom.

{¶ 43} With regard to assisting in his defense, Clifton could name his defense counsel and described him as a public defender. He said he would listen to his attorney's

advice and consider his recommendations and said he could be most helpful to his attorney by telling him everything and being honest.

{¶ 44} Dr. Foulk asked Clifton to describe his thoughts, feelings, motivations, and behaviors shortly before, during, and after the time period that included the offenses, and he was able to do so. His answers were coherent and logical, and he was able to discuss the events in a relevant and consistent manner. There were no obvious delusional intrusions that distorted his version of events. He said he was comfortable telling his attorney his version of events, and that they had not discussed it yet.

{¶ 45} He was also able to discuss potential legal strategies. Clifton had a clear motivation for a favorable outcome at trial and would like to be found not guilty. But if he was found guilty, he would like to have the sentence minimized.

{¶ 46} Dr. Foulk believed that Clifton had the ability to challenge prosecution witnesses and was coherent and stable enough in his mental state to testify relevantly. Dr. Foulk further believed that Clifton would have the capacity to tolerate the stress of a trial. She believed that there was a low risk of his acting inappropriately during or near the time of his court proceedings.

{¶ 47} Dr. Foulk noted that Clifton presented with a relatively recent onset of severe mental illness over the course of the last two years, and since at least 2022. That illness was predominated by psychotic symptomatology including delusions, paranoia, and auditory and visual hallucinations. Dr. Foulk believed that given Clifton's age—24-years-old—and the lack of a previous mental health history, it was likely that Clifton had experienced a "first episode psychotic break." Dr. Foulk stated that Clifton's medical disorder had been noted to impair his cognitive functioning, mood, and perceptual abilities and was more appropriately characterized as a psychotic spectrum disorder. But during

his interview with Dr. Foulk, Clifton presented with no overt symptoms of mental illness. His thoughts were logical, clear, and organized.

{¶ 48} Dr. Foulk further noted that Clifton had a substantial and long-standing history of substance abuse including daily or almost daily use of marijuana in various forms. His substance abuse complicated his clinical picture in trying to determine a specific disorder and it could not be determined how much his substance abuse impacted his brain functioning and mental illness. Clifton was clearly experiencing a form of severe mental illness, but his symptoms appear to have diminished over time and in the absence of substances of abuse.

{¶ 49} Ultimately, Dr. Foulk opined that Clifton understood the nature and objective of the proceedings against him and was capable of assisting in his own defense and was therefore competent to stand trial.

### G. Third Competency Hearing

{¶ 50} After receiving Dr. Foulk's report, the court held a third competency hearing in June 2024. At the hearing, counsel for the State and Clifton stipulated to the report for the purposes of the competency determination. The court thereafter found that Clifton was competent to stand trial.

{¶ 51} After making this finding, the court raised the issue of Clifton's refusal to be evaluated for NGRI and whether his plea had changed. Clifton's counsel indicated that it was his belief that Clifton had a clear understanding of what NGRI is and what would be the result if he were found to be NGRI and he was declining to pursue that option. Clifton agreed that this was his choice and that it was his "free will." The court scheduled a jury trial for February 2025.

**H. Refusal to Meet with Counsel**

{¶ 52} Approximately six months later, on January 10, 2025, the parties appeared before the court for a pretrial hearing. Defense counsel informed the court that they had previously been able to meet with Clifton and review discovery. However, beginning in December 2024, Clifton began refusing to meet with his counsel.

{¶ 53} In response, the trial judge spoke to Clifton, stating that "this is your life. And it can be whatever you make of it. Understand that I appointed two people that have handled significant trials in this courtroom, including murders before . . . do you understand that?"

{¶ 54} The record reflects that Clifton nodded his head affirmatively. The court then asked Clifton to respond verbally, and he stated: "Well, the meetings were not mandatory, and this [meaning the court hearing] is. So, here I am."

{¶ 55} The court then indicated that Clifton should consider his future meetings with counsel as mandatory from now until his trial. Clifton did not directly respond, but stated "well, like you said. . ."

{¶ 56} On February 10, 2025, the court held another pretrial hearing after learning that Clifton was continuing to refuse to meet with his defense counsel in jail. At the hearing, defense counsel stated that trial was to begin in three weeks, and they wished to update Clifton on ongoing negotiations as well as prepare him for trial and that it was becoming urgent that he begin participating in discussions. When asked if he understood those concerns, Clifton provided no response but stated "Hmm" repeatedly. The court then indicated that it would keep Clifton there "all day, if need be" to have conversations with his counsel. There is nothing in the record indicating whether Clifton began having discussions with counsel that day.

## I. The Trial

{¶ 57} The matter proceeded to a jury trial. The facts at trial were mostly undisputed. Evidence was presented that Clifton's grandparents and cousin were sitting in the living room watching television when Clifton emerged from his room with a gun and shot his grandfather in the head from close range. Clifton also shot his grandmother, who later learned at the hospital that she had been shot multiple times. He shot his cousin. Clifton was found by police sitting outside the home. Clifton did not testify at trial.

## J. Clifton's Request to Represent Himself, for a "Misjudge," and for Bond

{¶ 58} At the beginning of the second day of trial, defense counsel informed the judge that at the end of the first day of trial, Clifton told them that he wished to terminate their representation and wanted to represent himself. He told them that it would be a "mistrial" if they continued to speak on his behalf. Defense counsel described Clifton as "passionate" about representing himself at trial.

{¶ 59} The State objected to the request as untimely and cited case law in support of that position.

{¶ 60} The court considered the matter and overruled Clifton's request to represent himself. The following exchange then occurred:

> THE DEFENDANT: I would like to disagree. And I would need more details for him to use that as evidence to deny my -- my plea and my my --
>
> THE COURT: It's not evidence. It's case law. It's right there.
>
> THE DEFENDANT: It's right there? I don't know what that is. I can't even see it. But there could have been so many circumstances to cause it to be untimely. That don't carry over to this case. You know, I can -- I can represent myself.
>
> THE COURT: Mr. Clifton, I have done nothing but attempt to protect your rights.
>
> THE DEFENDANT: I'm --

THE COURT: I have done nothing but try to protect your rights, to get you to work with your lawyers. I even went on the record, how many times with you, to tell you it's in your best interest to talk to your lawyers.

THE DEFENDANT: I don't want lawyers.

THE COURT: right? I did that right?

THE DEFENDANT: I do -- do not want lawyers.

THE COURT: No, no, no.

THE DEFENDANT: Yes.

THE COURT: I did that, right?

THE DEFENDANT: Yes.

THE COURT: Okay. The Court has reviewed State versus Neyland. At this point in time, I find that the request to represent himself is untimely made. That it is actually an effort to subvert the -- or come to --

THE DEFENDANT: I demand for a misjudge.

THE COURT: conflagrate the proceedings. His motion will be overruled.

THE DEFENDANT: I demand for a misjudge immediately.

THE COURT: Excuse me?

THE DEFENDANT: I demand for a misjudge immediately.

THE COURT: A misjudge?

THE DEFENDANT: A misjudge immediately.

THE COURT: What's a misjudge?

THE DEFENDANT: That you should not be my Judge for this -- for this Trial for this case. You are a misjudge.

THE COURT: Overruled.

THE DEFENDANT: You overrule. I take it up with the legislative branch, with the DA, District Attorney on camera.

- 15 -

THE COURT:  Whatever you want.

THE DEFENDANT:  It's on camera.

THE COURT:  Is counsel ready to proceed?

MR. MAUS: Yes, Your Honor.

MR. CORBIN: State's ready, Your Honor.

THE COURT: Call your first witness.

THE DEFENDANT:  Am I just gonna be ignored?

MR. MILLER: Judge?

THE COURT:  Huh (no verbal response?)

MR. MILLER: (Indicating to bring the Jurors into the courtroom.)

THE COURT: Oh, yeah.

THE DEPUTY:  I need you to stand up.

THE DEFENDANT:  Can you move this back, just a tad?

THE DEPUTY: Yeah.

THE DEFENDANT:  Thanks.

(Whereupon, the deputy adjusted the Defendant's handcuffs, after which the following transpired.)

THE DEPUTY: All right.  Sit back down.

THE DEFENDANT:  (Complying.)

THE COURT:  Are you ready?

MR. MAUS: Yes, Your Honor.

THE COURT: Bring in the Jury.

THE BAILIFF:  All rise.

{¶ 61} At the end of the second day, after the jury left the courtroom, the following occurred:

THE DEFENDANT: Hey, bailiff, I need to talk to you, bailiff. I want out on bond today. I want to be out on bond today. Bailiff, you heard me. And, Judge, you heard me, too. I want out on bond today. Judge, I want out on bond today. Misjudge, the cameras are all on ya. We'll see it later.

You, too (Indicating to Mr. Maus.)

Yeah, you, too, buddy (Indicating to Mr. Walker.)

I'm not arrested. I'm out on bond.

I'm out on bond, bailiff. I'm out on bond.

DEPUTY ERNST: Go back there (Indicating to the holding area.)

THE DEFENDANT: You heard me, huh?

THE DEPUTY: Come on, let's go.

THE DEFENDANT: I'm out on bond. I'm out on bond. You'll find out. Okay? Let me bond out today. Today. (Inaudible.)

The cameras are on, yeah (Indicating to the deputy?)

THE DEPUTY: Yep.

THE DEFENDANT: Yeah.

{¶ 62} At the beginning of the third day, the court spoke to Clifton, referencing the outburst that occurred at the end of the prior day. The following exchange occurred:

THE COURT: Mr. Clifton, there was an outburst yesterday afternoon. I will expect that there will be no other outbursts.

THE DEFENDANT: How about my bond?

THE COURT: I expect there to be no other outbursts.

THE DEFENDANT: I asked a question.

THE COURT: I expect there to be no other outbursts.

- 17 -

THE DEFENDANT: I want out on bond, as soon as possible, immediately.

THE COURT: You already have a bond.

THE DEFENDANT: Was it financially obligated?

THE COURT: Excuse me?

THE DEFENDANT: Was it financially paid?

THE COURT: I didn't hear ya.

THE DEFENDANT: Was my bond financially paid?

THE COURT: Paid? Did you pay it?

THE DEFENDANT: Someone did. I'm in jail. I can't pay it myself. That's impossible. So you don't know?

THE COURT: So, it wasn't paid.

THE DEFENDANT: And -- yeah, my bond wasn't paid financially?

THE COURT: No outbursts.

THE DEFENDANT: I'm asking a question.

And I have to talk loud enough for you to hear me.

THE COURT: No outbursts.

THE DEFENDANT: You didn't answer my question.

THE COURT: Are you done?

THE DEFENDANT: Uh, I'm not done, appears I'm still asking a question.

THE COURT: Bring in the Jury.

THE DEFENDANT: All right. Guess it wasn't answered.

**K. Jury Verdict and Sentence**

{¶ 63} The jury found Clifton guilty on all counts and to all specifications. The court sentenced Clifton to a prison term. Clifton appealed, raising a single assignment of error.

## II. Law and Analysis – Ineffective Assistance of Counsel

{¶ 64} Clifton's assignment of error states:

MR. CLIFTON'S TRIAL COUNSEL WERE INEFFECTIVE FOR NOT RE-RAISING THE ISSUE OF HIS COMPETENCY BEFORE OR DURING TRIAL. JAN. 10, 2025 PRETRIAL; FEB. 10, 2025 PRETRIAL; TRIAL TR.; R.C. 2945.37(B); *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984); *STATE V. BOCK*, 28 OHIO ST.3D 108 (1986); *DROPE V. MISSOURI*, 420 U.S. 162, 172 (1975); *STATE V. LAWSON*, 2021-OHIO-3566.

{¶ 65} Clifton argues that he received ineffective assistance of counsel when his defense counsel did not re-raise the issue of his competency to stand trial (1) when Clifton began refusing to meet with them in December 2024, and (2) during trial, as a result of Clifton's several outbursts. Clifton argues that the record contains sufficient indicia of his incompetency and therefore his counsel was deficient for failing to request a fourth competency evaluation. Clifton argues that the record also establishes a reasonable probability that he would have been found incompetent to stand trial and that he therefore has established prejudice.

### A. Law Applicable to Ineffective Assistance Claims

{¶ 66} To prevail on an ineffective assistance of counsel claim, Clifton must show his defense counsel's performance was deficient, and that he was prejudiced as a result. *State v. Clarke*, 2016-Ohio-7187, ¶ 49 (12th Dist.); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Defense counsel's performance will not be deemed deficient unless it falls below an objective standard of reasonableness. *Strickland* at 688. To show prejudice, Clifton must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of his trial would have been different. *Id.* at 694. The failure to satisfy either prong of the *Strickland* test is fatal to an ineffective assistance of counsel claim. *See Clarke* at ¶ 49. We strongly presume that defense counsel rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Burns*, 2014-Ohio-4625, ¶ 7 (12th Dist.). It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence . . . ." *Strickland* at 689.

## B. Due Process, Competency, and the Competency Hearing Statute

{¶ 67} "[T]he Due Process Clause of the Fourteenth Amendment to the United States Constitution requires procedures adequate to 'protect a defendant's right not to be tried or convicted while incompetent to stand trial.'" *State v. Mills*, 2023-Ohio-4716, ¶ 10, quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975). "Ohio has enacted a statute, R.C. 2945.37, that details procedures to protect this right." *Id*.

{¶ 68} R.C. 2945.37(G) provides that "a defendant is presumed to be competent to stand trial." But this presumption can be overcome:

> If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code.

R.C. 2945.37(G).

{¶ 69} R.C. 2945.37(B) provides that a court "shall" hold a hearing on the issue of competence to stand trial when that issue is raised before trial is commenced. If the issue of competency is raised after trial has commenced, the court shall hold a hearing "only for good cause shown or on the court's own motion."

{¶ 70} R.C 2945.37(G) provides that, if, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings

- 20 -

against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial.

## C. The Competency Test

{¶ 71} The test for competency "'focuses entirely on the defendant's ability to understand the meaning of the proceedings against him and his ability to assist in his own defense, which can be satisfied regardless of the defendant's mental status or IQ.'" *State v. Edwards*, 2023-Ohio-4173, ¶ 19 (12th Dist.), quoting *State v. Walker*, 2023-Ohio-140, ¶ 23 (6th Dist.). Incompetency should not be equated with "'mental or emotional instability or even with outright insanity.'" *Id*. quoting *State v. Bock*, 28 Ohio St.3d 108, 110 (1986). A defendant may be emotionally disturbed or even psychotic, but still capable of understanding the charges against him and assisting in his own defense. *Id*. In other words, mental illness, alone, does not trigger a duty by defense counsel to request a competency evaluation. *Id*., citing *Walker* at ¶ 23.

{¶ 72} A defendant is rebuttably presumed competent to stand trial or plead guilty when he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him. *State v. Lawson*, 2021-Ohio-3566, ¶ 48-49. The burden of rebutting the presumption and establishing incompetency by a preponderance of the evidence is on the defendant. *Edwards* at ¶ 16.

## D. Ineffective Assistance of Counsel and Claims of Incompetency

{¶ 73} A trial counsel's failure to seek a competency evaluation is not "per se" ineffective assistance of counsel. *Edwards* at ¶ 11, citing *State v. Brewer*, 2021-Ohio-2289, ¶ 12 (12th Dist.). "It is only where the facts and circumstances indicate appellant did not understand the nature and objective of the proceedings and was incapable of assisting in his defense . . . that it is ineffective assistance of counsel" to fail to pursue a

competency hearing. *Id*. When the record displays "sufficient indicia of incompetency," trial counsel may be ineffective for failing to request a competency evaluation. *See Lawson* at ¶ 95.

{¶ 74} To demonstrate the prejudice component under *Strickland*, an appellant must show that there is a reasonable probability that an evaluation "'would have revealed that he was incompetent to stand trial.'" *Id.* at ¶ 104, citing *Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir.1988).

### E. The "Sufficient Indicia of Incompetency" Standard

{¶ 75} The Ohio Supreme Court has defined the "sufficient indicia of incompetency" standard in several cases that considered the effect of a trial court's failure to hold a required competency hearing under R.C. 2945.37. Clifton relies primarily on the following cases to support his argument that the record in his case reflects "sufficient indicia of incompetency," such that his counsel were ineffective for failing to raise the issue of his incompetency shortly before and during trial: *State v. Bock*, 28 Ohio St.3d 108 (1986); *State v. Were*, 94 Ohio St.3d 173 (2002); *State v. Hough*, 2022-Ohio-4436; and *State v. Mills*, 2023-Ohio-4716.

{¶ 76} In *Bock*, the Ohio Supreme Court set the standard for when a trial court's failure to hold a statutorily required competency hearing constitutes reversible error. The Court held that,

> the right to a hearing on the issue of incompetency rises to constitutional proportions only when the record contains sufficient indicia of incompetency, *see Drope v. Missouri* (1975), 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103, such that a formal inquiry into defendant's competency is necessary to protect his right to a fair trial.

*Bock* at 110.

{¶ 77} The Court found that Bock's record did not contain sufficient indicia of incompetency. *Id*. at 111. There, Bock's attorney had requested a competency hearing and alleged that Bock was in the hospital for drug-related problems. *Id*. at 110. The trial court never held a hearing on competency. But after counsel filed this initial motion, counsel never again mentioned or raised the issue of Bock's competency. *Id*. at 111. There was nothing in the record to indicate any behavior on Bock's part that might indicate incompetency. *Id*. Nor did Bock submit any expert or lay opinions to the trial court that might indicate incompetency. Bock himself testified at trial and exhibited no behaviors indicating incompetence. *Id*.

{¶ 78} Contrast *Bock* with *Were*, where the Ohio Supreme Court found sufficient indicia of incompetency and held that the failure to hold a requested competency hearing was constitutional error requiring reversal. 94 Ohio St.3d at 175-177. There, the supreme court found that the record was "replete" with suggestions of Were's incompetency. *Id.* at 175. This evidence included (1) defense counsel directly and repeatedly raising the issue of the Were's incompetency to the trial court throughout the proceedings, (2) Were's accusations that his counsel were secretly recording their conversations and turning the tapes over to the state, (3) Were's refusal to speak with his counsel and defense team and refusal to accept their correspondence, (4) evidence that Were was delusional and paranoid based on pro se motions in which he moved the trial court to dismiss his attorneys and accused them of threatening his life. *Id*. at 175-176.

{¶ 79} Likewise, in *Hough*, the Ohio Supreme Court again found that the failure to hold a competency hearing was reversible error and found "significant" indicia of incompetency. 2022-Ohio-4436, at ¶ 37. This conclusion was based on evidence in a mitigation report and Hough's defense counsel's statements at sentencing. *Id*. The

mitigation report stated that Hough was unable to provide the week, date, month, or year, held several delusional beliefs, such as the belief that others could control his thoughts or force thoughts into his head, and that people were trying to follow him. *Id*. at ¶ 32. Hough also admitted to experiencing auditory hallucinations and appeared to be responding to internal stimuli. *Id*.

{¶ 80} At sentencing, Hough's counsel stated that Hough had some "very real diagnoses" and that he responded to "external stimuli" and it made counsel "wonder whether or not he was competent." *Id*. at ¶ 35. Counsel stated, "If he is hearing voices and does not know who he is and he thinks God is speaking to him, that goes to the heart of whether or not he can stand and/or sit in front of a Court and actually be helpful in his defense." *Id*.

{¶ 81} But the Ohio Supreme Court found insufficient indicia of incompetency in *Mills*. The supreme court first noted that in reviewing the insufficient-indicia-of-incompetency standard under *Bock*, a reviewing court must consider the totality of the evidence, including both evidence of incompetency and evidence of competency. 2023-Ohio-4716, at ¶ 21.

{¶ 82} Mills raised several instances during trial court hearings that he argued indicated incompetency. During those proceedings, Mills expressed frustration and confusion concerning the trial process, or complaints regarding his attorney's availability. He also pointed to a statement by defense counsel that counsel could not assure the trial court that he had effectively explained the state's plea offer to Mills because of Mills' desire not to discuss that plea with him. *Id.* at ¶ 22-24.

{¶ 83} In finding that these instances did not establish sufficient indicia of incompetency, the Ohio Supreme Court noted that Mills responded appropriately to explanations concerning his confusion, and that Mills on multiple occasions confirmed

that he understood the trial court's explanation of the plea offer. *Id*. at ¶ 22, 25. The supreme court found nothing in the record that would demonstrate any inability of Mills to understand the proceedings or to assist in his defense. *Id*. at ¶ 24.

{¶ 84} The Ohio Supreme Court also rejected Mills' claim that a series of outbursts concerning a delay in his trial demonstrated indicia of incompetency. *Id*. at ¶ 26. The supreme court found that these outbursts indicated that Mills was frustrated with the pace of the proceedings and that at times he acted out on this frustration. *Id*. at ¶ 30. But nothing indicated he failed to understand the nature of the proceedings or that he lacked capacity to assist his attorney. *Id*.

{¶ 85} Finally, the supreme court noted that the record of the trial demonstrated that Mills was capable of understanding legal concepts and assisting in his defense. *Id*. at ¶ 27. Mills had expressed discomfort with the racial composition of the jury panel, and his attorney raised that issue in a chambers conference in which Mills participated. When the state later used one of its peremptory challenges to excuse a black juror, Mills' counsel raised a *Batson* challenge. When the trial court overruled the objection, Mills stated "This is racist." *Id*.

## F. Analysis

{¶ 86} Clifton argues that this case is most like *Hough*. He notes that he and Hough were both diagnosed with "severe mental illness" and exhibited delusional beliefs. As to his delusional beliefs, Clifton refers to his repeated and false assertion that his bond had been paid and that he should be released. Clifton also refers to his documented paranoia and delusional belief system, which was discussed extensively in his first evaluation by Dr. Davis.

{¶ 87} Clifton argues that his case is also similar to *Were* in that he began refusing to speak with his attorneys as trial approached and that this was affecting counsels' ability

to prepare him for trial and effectively defend him at trial. He also notes as in *Were*, Clifton attempted to dismiss his attorneys.

{¶ 88} In analyzing this issue, we first note that neither *Hough* nor *Were* involved an ineffective-assistance-of-counsel claim. Instead, those cases addressed a scenario where the defendant's counsel had requested a competency evaluation, and the trial court had ignored the request or issued a decision without a hearing. *Hough*, 2022-Ohio-4436, at ¶ 4-5; *Were*, 94 Ohio St.3d at 174. In neither case was the defendant afforded a hearing on competency and, thus, in both cases the defendant was unable to create a record supporting a finding regarding competency.

{¶ 89} That is a crucial distinction. Here, the court ordered an evaluation into Clifton's competency to stand trial. And the court and the parties received the benefit of not one evaluation, but three. The two latter evaluations both found that Clifton's paranoid and delusional thinking had subsided, possibly in the absence of sustained use of THC and THC-products, and that Clifton exhibited an aptitude for understanding the legal proceedings and also exhibited the *ability* to communicate effectively with the interviewer. It was this latter point that convinced both doctors that Clifton was *capable* of assisting in his defense.

{¶ 90} Clifton began refusing to meet with his attorneys in December 2024, only two months prior to trial. His reasons for doing so are not clear from the record. However, his reluctance to meet with defense counsel does not necessarily indicate that he lacked the capacity to assist in his defense. Instead, the record indicates that the refusal to meet with counsel was a choice, which is borne out by the brief discussion Clifton had with the trial court concerning the issue.

{¶ 91} When asked by the court why he would not meet with his counsel, Clifton responded coherently. He did not feel that meetings with counsel were mandatory, but he

acknowledged that the court hearing was mandatory, and so he appeared. The fact that Clifton may have made poor choices with respect to his legal defense does not demonstrate a lack of capacity to meet with counsel and assist in his defense.

{¶ 92} Like in *Mills*, Clifton's several outbursts during trial demonstrate that Clifton was frustrated with his counsel and the trial court but do not indicate incapacity. The first outburst occurred after counsel discussed Clifton's request to fire his attorneys and represent himself. Notably, defense counsel described Clifton as "passionate" about his wish to represent himself. Being "passionate" does not indicate irrationality but instead indicates that Clifton had an awareness of the legal proceedings and his potential right to represent himself in a trial. The acrimonious exchange he had with the court afterwards, in which he complained about not wanting his lawyers and then asking for a "misjudge" suggests that Clifton was frustrated with the court's decision. He may not have been sophisticated in his use of legal terminology, but he was clearly expressing frustration with both his attorneys and with the judge's ruling. But Clifton's expression of frustration is not indicative of a lack of ability to understand the nature of the proceedings or an inability to assist in his defense. *Mills*, 2023-Ohio-4716, at ¶ 30.

{¶ 93} Clifton's second outburst, at the end of the second day of trial, is more concerning, as he repeatedly appeared to indicate that he was "out on bond." This was an issue that Clifton had expressed confusion about for some time, as he had first asked the court about the status of his bond in an April 2024 hearing. The court explained to him that his bond was never paid, and he indicated at that time that he understood.

{¶ 94} Clifton's comments suggest confusion or irrational thinking about the status of his bond. However, the court and counsel were all present during this exchange. The court and defense counsel were in a better position than us to determine whether Clifton's remarks were intended to be disruptive, rather than demonstrating that Clifton lacked the

capacity to understand the proceedings and assist in his defense. The court had earlier commented that it believed that Clifton was intentionally acting out in an effort to "conflagrate" the proceedings, and the trial court was in a better position than this court to assess that issue.

{¶ 95} Clifton's third outburst also concerned his claim that his bond had been paid. But this exchange also does not demonstrate a lack of capacity. While Clifton seemingly could not understand that his bond had not been paid, he also responded in a coherent manner when the court declined to engage him in a continued discussion about whether or not his bond had been paid. That is, Clifton correctly characterized the court as being non-responsive to his continued complaints about his bond (stating, "You didn't answer my question" and "All right. Guess it wasn't answered."). This exchange appears more argumentative than demonstrating a lack of capacity to understand the proceedings or a lack of capacity to assist in his defense.

{¶ 96} We also note that all of Clifton's outbursts occurred outside the presence of the jury. Appellate counsel has not cited any incidents of improper behavior that occurred during the jury's presence. This indicates Clifton continued to understand the nature of the proceedings and the importance of acting appropriately in the jury's presence.

{¶ 97} In sum, we cannot find on this record that Clifton's trial counsel acted deficiently by failing to move for a competency hearing either shortly before trial or during the trial. There is no doubt that Clifton has mental health concerns and has a prior history of psychotic breaks. However, incompetency cannot be equated with mental or emotional instability or even outright insanity. *Edwards*, 2023-Ohio-4173 at ¶ 19. Clifton's decision to stop meeting with his defense counsel shortly before trial appears to be just that—a decision. Clifton responded appropriately, albeit obstinately, when asked why he was not meeting with counsel, stating that he did not consider it mandatory. He did not express

any paranoid or delusional reasons for failing to meet with counsel. Trial counsel was aware of Clifton's diagnoses and would have had the benefit of that knowledge in assessing whether Clifton's behavior was driven by these mental health issues, or rather, intentional or dilatory. *See State v. Braden*, 2003-Ohio-1325, ¶ 113-117 (holding that a defendant's diagnosis of paranoid schizophrenia was not synonymous with incompetence to stand trial and the attorney's performance was not deficient where attorneys were alert to the possibility of the defendant's incompetence). Clifton's "outbursts" during trial appear to reflect confusion or frustration with the trial process but do not demonstrate sufficient indicia of incapacity for us to second-guess defense counsel.

{¶ 98} For the same reasons set forth above, we do not find that the record supports the conclusion that there is a reasonable probability that a fourth competency evaluation would have resulted in Clifton being found incapable of being tried. Therefore, Clifton has not established prejudice for purposes of *Strickland*.

{¶ 99} We overrule Clifton's sole assignment of error.

### III. Conclusion

{¶ 100} Clifton has not established that his trial counsel provided constitutionally deficient performance for failing to move for a fourth competency evaluation shortly before or during trial. The record does not indicate sufficient indicia of incompetency necessary to trigger any duty on counsel's part to move for a competency evaluation. Additionally, Clifton's decision to terminate communications with his counsel, his uncooperative nature, and outbursts at trial do not establish a reasonable probability that a fourth competency hearing would have resulted in a finding of incompetency.

{¶ 101} Judgment affirmed.

PIPER and SIEBERT, JJ., concur.

- 29 -

- 30 -

## J U D G M E N T   E N T R Y

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Brown County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

*/s/ Matthew B. Byrne, Presiding Judge*

*/s/ Robin N. Piper, Judge*

*/s/ Melena S. Siebert, Judge*